11 A.3d 381

DIVISION OF YOUTH AND FAMILY SERVICES, PLAINTIFF–
RESPONDENT, v. M.D., DEFENDANT–APPELLANT, AND
S.D.,[1] DEFENDANT.

IN THE MATTER OF N.D., S.D., AND G.D., MINORS.

Superior Court of New Jersey
Appellate Division

Argued November 3, 2010—Decided January 12, 2011.

---

[1] S.D.'s trial counsel was served with defendant's Notice Of Appeal. *See R.* 1:11–3 (providing that "[f]or purposes of appeal ... the attorney of record for the adverse party in the court below shall be considered as attorney for the respondent, and notice and papers served upon that attorney shall be deemed good service"). No appearance was filed on S.D.'s behalf, and he has not participated in this appeal.

584

586

Before Judges CARCHMAN, MESSANO and WAUGH.

*Michael C. Wroblewski,* Designated Counsel, argued the cause for appellant M.D. (*Yvonne Smith Segars,* Public Defender, attorney; *Mr. Wroblewski,* on the brief).

*Victoria A. Galinski,* Deputy Attorney General, argued the cause for respondent (*Paula T. Dow,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Galinski,* on the brief).

*James A. Louis,* Deputy Public Defender, argued the cause for minors N.D., S.D. and G.D. (*Yvonne Smith Segars,* Public Defender, Law Guardian, attorney; *Christopher A. Huling,* Assistant Deputy Public Defender, of counsel and on the brief).

The opinion of the court was delivered by

MESSANO, J.A.D.

This appeal requires us to consider a recurring issue in Title 9 and Title 30 litigation. Specifically, when a defendant stipulates to a finding of abuse and/or neglect at a fact-finding hearing, what information must counsel provide to the defendant to insure he or she has made a knowing and voluntary waiver of his or her rights, and what are the obligations of the judge in accepting such a stipulation? In this case, the issue arose in the context of a contentious divorce and bitter custody dispute.

We conclude that neither defense counsel nor the judge provided defendant with the minimum, necessary information regarding the consequences of the stipulation. We also conclude that given the significant rights a defendant waives by entering such a stipulation, and the frequency with which issues regarding these stipulations are raised on appeal, trial counsel and Family Part judges must make specific inquiries of the defendant on the record, as set forth below, before accepting a stipulation. We also refer the matter to the Supreme Court's Committee on Practice in the Family Part, and the Acting Administrative Director of the Courts, and suggest that a form be adopted and used at all fact-finding hearings wherein the defendant intends to stipulate to a finding of abuse and/or neglect.

I

Defendant M.D. appeals from two orders of the Family Part. The September 10, 2009 order terminated the Title 9 litigation initiated by the Division of Youth and Family Services (DYFS or the Division) and granted defendant's ex-husband, S.D., custody of the couple's three minor children. The December 10, 2009 order denied defendant's motion for reconsideration.

Although not specifically listed in defendant's Notice of Appeal, based upon her brief and the arguments of counsel, two other orders entered by a different Family Part judge are also at issue. On April 11, 2008, after a "Dodd" hearing, the judge ordered the

continued removal of defendant's children from her custody.[2] *See N.J.S.A.* 9:6–8.31(b) (permitting "continued removal [when] necessary to avoid an ongoing risk to the child's life, safety or health"). At a September 17, 2008 fact-finding hearing, following defendant's stipulation, the judge entered an order finding that defendant had neglected her children by "le[aving] the burners and oven on in the home to heat the home thus posing a risk to the minor children."

On appeal, defendant has raised the following points for our consideration:

POINT I: M.D. WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL PRIOR TO AND DURING THE STIPULATION TO NEGLECT (not raised below).

POINT II: THE TRIAL COURT ERRED BY TRANSFERRING CUSTODY OF [George [3]] TO HIS FATHER.

POINT III: M.D. WAS DENIED DUE PROCESS OF LAW AS THE CHANGE OF CUSTODY AT THE DISPOSITIONAL HEARING WAS CONDUCTED AT A LESSER EVIDENTIARY STANDARD THAN IT WOULD HAVE BEEN HAD THE CHANGE OF CUSTODY OCCURRED UNDER THE FM DOCKET.

POINT IV: THE TRIAL COURT ERRED BY INTERVIEWING THE CHILD N.D. AND THE SUBSEQUENT INTERVIEW OF N.D. AND S.D. WAS INADEQUATE, DID NOT GIVE COUNSEL FOR M.D. AN OPPORTUNITY TO SUBMIT QUESTIONS PURSUANT TO *R.* 5:8–6, AND DID NOT GIVE M.D. AN OPPORTUNITY TO ANSWER THE ISSUES RAISED IN THE INTERVIEW (partially raised below).

POINT V: THE EMERGENCY REMOVAL (DODD) HEARING VIOLATED M.D.'S CONSTITUTIONALLY PROTECTED RIGHTS AS IT FAILED TO ESTABLISH THAT REMOVAL OF S.D. AND G.D. FROM M.D.'S CARE WAS NECESSARY TO AVOID AN ONGOING RISK TO LIFE, SAFETY OR HEALTH OF THE CHILDREN.

Because we conclude that defendant was denied the effective assistance of counsel at the fact-finding hearing, we reverse.

---

[2] Former Senate President Frank J. 'Pat' Dodd was the primary author of the legislation enacting these removal procedures and other provisions contained in Title 9. *See N.J. Div. of Youth and Family Servs. v. J.D.,* 417 *N.J.Super.* 1, 4 n. 1, 8 A.3d 236 (App.Div.2010).

[3] We have fictionalized the first names of the children.

(a)

Defendant and S.D. are the parents of three children: a son, Neal, born in 1994; a daughter, Samantha, born in 1995; and a son, George, born in 2002. Well before DYFS initiated this complaint, defendant and S.D. had already appeared in the Family Part in other litigation.

For example, defendant had filed various domestic violence complaints against S.D. An amended final restraining order, dated October 27, 2006, granted defendant possession of the couple's home in Washington Township, barred S.D. from the residence and the children's elementary school, and awarded defendant custody of Samantha and George and gave S.D. custody of Neal.

In addition, defendant and S.D. were in the midst of a divorce. Although we cannot discern from the record when the complaint for divorce was filed, an order to show cause was entered on December 21, 2007, in the FM action granting S.D. temporary custody of all three children pending the return date on January 4, 2008. Defendant was granted "supervised custody with the children at [S.D.'s] discretion." The reasons, as listed by the judge on the face of the order, included S.D.'s certification that defendant had been "hospitalized . . . in an apparent suicide attempt." Although the order is not part of the record, the judge awarded defendant pendente lite custody of Samantha and George on the January return date. Thus, when these proceedings were initiated, on April 11, 2008, residential custody of Samantha and George remained with defendant, and Neal resided with his father.

The Division's verified complaint against defendant and S.D. sought custody of all three children. The complaint detailed the Division's contacts with the family, beginning in 1997 and ending with the removal of Samantha and George from defendant's custody on April 10, 2008. We recite some of the allegations to provide a more complete picture of the acrimonious relationship that existed between defendant and S.D.

On June 2, 1999, DYFS received a report that Samantha, three years old at the time, was found alone at the Clinton Community Care Center. Defendant had left her daughter with an adult friend while she ran errands, and that friend had forgotten the child at the Center. No finding of abuse or neglect was made.

On September 12, 2001, the Division received a referral from the Crisis Intervention Unit (CIU) alleging that defendant was "an untreated bi-polar, [had] pulled a knife on [S.D.] th[at] morning," and was "suicidal and homicidal." It is unclear who made the report to CIU.

When contacted by DYFS, S.D. was "rather complacent." DYFS assessed defendant at her home that day, and, although she was "visibly upset," she "was not irrational or erratic." Defendant denied any history of mental illness and told the caseworker that she was planning to divorce S.D., citing financial difficulties and various incidents of domestic violence. Defendant told the caseworker that she had dismissed an earlier restraining order against S.D. after being pressured by him and his family. The CIU worker interviewed defendant's neighbors who "reiterated that [S.D.] was the problem not [defendant]." Defendant was taken to the local police department, a domestic violence temporary restraining order was issued against S.D., and he was ordered to leave the home.

The Division's caseworker interviewed Neal and Samantha the next day. Neal denied that his mother had threatened S.D. with a knife and both denied that they were fearful of their parents. Neal told the caseworker that his parents "ha[d] been arguing a lot," and that they "f[ou]ght a lot about money." When S.D. was interviewed by the Division two days later, he denied any incidents of domestic violence but admitted that defendant had previously obtained a restraining order against him. S.D. claimed that defendant was diagnosed with bi-polar disorder five years earlier, had repeatedly threatened him with knives and had threatened to kill him and the children. DYFS closed its case file in October 2001 without any finding of abuse or neglect.

In December 2004, the Division received a referral from Florida Child Protective Services regarding an incident that occurred on November 24 while the family was attending a motocross event in that state.[4] According to the report, when S.D. returned from the event late in the evening, he found the three children standing outside the motel room. They claimed to have left the room because defendant was making too much noise. S.D. confronted defendant, who was apparently speaking with a man from a neighboring room, and physically assaulted her. S.D. was arrested that night and made bail.

DYFS re-opened its file and conducted an investigation of the incident. Defendant told the caseworker that Neal was staying with S.D. in Florida. She claimed that her son went to Florida with S.D. every winter, had become "a professional dirt bike racer," and, because he had missed so much school, was being "home schooled while ... in Florida." Defendant told the caseworker that Samantha had been diagnosed with "selective mutism," i.e., "she d[id] not talk to anyone she d[id] not know." The caseworker noted that Samantha did not respond when she greeted the child. George had "delayed speech" and was receiving in-home therapy. Defendant told the caseworker that she had filed for divorce in August.[5] She also reiterated some of the history of domestic violence that existed between her and her husband. DYFS referred defendant to a local domestic abuse resource center.

In February 2005, DYFS received an anonymous report that defendant left the three children unsupervised at home on multiple occasions. The reporter also stated that Neal was not registered in school because S.D. took him to motocross events at which Neal

---

[4] A "motocross" is a "cross-country motorcycle race over a course of rough terrain, as steep hills and hairpin curves." *Webster's II New College Dictionary* 715 (2d ed. 2001).

[5] This is inconsistent with the actual FM docket number which indicates the filing took place either in 2006 or 2007.

was paid. A DYFS caseworker met with all five members of the D. family. Defendant denied leaving the children alone. However, she verified that Neal and S.D. "travel[ed] all over the country so that [Neal] c[ould] compete in . . . motocross events[,]" where he "earn[ed] money." Defendant told DYFS that Neal was being tutored and was not "missing anything academically."

S.D. told the caseworker that his wife did not leave the children home alone. He also acknowledged that Neal was being privately tutored because he "miss[ed] too much school with his busy motocross schedule." S.D. denied any incidents of domestic violence other than his arrest in Florida.

Neal told the worker that defendant did not leave the children alone. Samantha "did not respond" to the worker's questions and George was too young to be interviewed. The caseworker noted that the children appeared clean and healthy. DYFS again concluded that there was no abuse or neglect of the D. children and closed its case.

On December 14, 2007, Neal, in the company of S.D., reported to his counselor at Hunterdon Behavioral Health that several days earlier, defendant had taken his cell phone, hit him in the arm and threatened to "run him over with the car." [6] S.D. stated that defendant had obtained a restraining order against him, that she had a "history of yelling" at both him and the children, and that she "threw a knife at him" on December 9. DYFS interviewed Neal the next day, during which the boy claimed that his mother was "out of control," threatened to kill herself and "need[ed] help." DYFS interviewed defendant's mother who stated that "neither parent [wa]s . . . fit." [7]

---

[6] Neal was attending behavioral therapy counseling sessions at the center, although it is unclear why.

[7] The Division's verified complaint alleged that defendant had herself been the victim of physical abuse at the hands of her mother, and, at age fifteen, had been removed from her mother's custody and placed first in a shelter, and then a foster home.

Defendant and S.D. were interviewed by a caseworker and both admitted to incidents of domestic violence in the home. S.D. said that he and defendant were going through a divorce, that he had custody of Neal, and, that while he did not intend to pursue custody of the other two children, he believed they should be removed from defendant's care. Defendant claimed that Neal was verbally and physically abusive toward her.

DYFS interviewed Samantha. She corroborated defendant's claim that Neal tried to hit their mother, that S.D. and defendant frequently fought and that both parents asked her to "say things against the other parent." George also told the caseworker that his parents fought all the time. DYFS concluded that the allegations of physical abuse by defendant toward Neal were unfounded, but recommended that defendant and S.D. undergo psychological evaluations and that the entire family attend therapy.

On December 21, 2007, DYFS received a referral from the Washington Township Police Department advising that defendant was taken to the Emergency Department at Warren Hospital. S.D. had called the police after receiving a text message from Samantha claiming that her mother was suicidal. Police officers dispatched to the family home convinced defendant to undergo a mental health assessment at the hospital. Defendant explained that she was not suicidal, and the crisis assessment team concluded that defendant was suffering from depression. After being issued a prescription, defendant was discharged. On the same day, S.D. sought the order to show cause we referenced above and obtained custody of all three children.

DYFS again conducted an investigation. At the time, defendant was staying with her sister because the furnace in her home needed repair and there was no heat. The Washington Township home was also in foreclosure. Defendant claimed that she was not suicidal and that Samantha had misunderstood a phone conversation defendant was having with her sister. Defendant told the caseworker that S.D. had taken Neal and George with him to Bermuda on vacation.

DYFS then interviewed Samantha who doubted that she had misconstrued her mother's phone conversation. Samantha preferred to live with S.D. or her paternal grandmother because defendant was mean and "d[id] not do anything for her," such as cook or clean. However, Samantha also told the caseworker that when she was mad at her grandmother, she sometimes texted defendant with false allegations, including claims that her grandmother was mean and hit her. The caseworker opined that Samantha seemed "coached" on what to say during the interview.

On January 18, 2008, DYFS received a report from Neal's doctor who had seen the boy and S.D. in his office that day. Neal claimed that defendant had kicked him in his lower back six to seven weeks prior. The doctor conducted an exam and found that the area "was not tender." He told DYFS that Neal's parents "may be having custody issues" and that "[S.D.] knew the child would tell him [about the incident] and that [the doctor] . . . would have to report this [to DYFS]."

When contacted by the Division, defendant denied kicking Neal. She also told DYFS that she had little contact with her oldest son, who now resided with S.D. in Chester at defendant's brother's apartment. Samantha told the caseworker that she "ha[d] no problems with her mom . . . [and that] [defendant] d[id] not use physical discipline and [wa]s not abusive." The caseworker concluded her report by noting, "it appears that until custody is resolved, referrals will continue to be made by the family."

The case was still open on February 1 when Samantha, accompanied by S.D., filed a police report alleging that defendant had entered her room while she was on the phone with her father, told her to get off the phone and hit her on her leg and arm. S.D. told the police that he "was going to the Family Court . . . to attempt to get a TRO to get full emergency custody of [Samantha] and [George] for their protection." S.D. told the caseworker that "he ha[d] his children at least 70% of the time and would like to attain full custody of all of his children because of his concerns with them

living with their mother." S.D. told DYFS that he "need[ed] $5000 to have a custody evaluation done."

The Division's caseworker, however, did not observe any bruises or marks on Samantha, who also claimed that her mother had hit her approximately one month earlier. The child told the caseworker that her mother never made breakfast for her and her brother, and that "they ha[d] to go to school hungry each morning."

On Saturday, February 2, the children's paternal grandmother called DYFS. She stated that Samantha was at her home in Bethlehem, Pennsylvania, and was "afraid to return home with [defendant]," who had allegedly told the child over the phone the previous evening, "Thanks for calling DYFS on me." DYFS was already intending to interview the family that day.

When the DYFS caseworkers arrived at the Washington Township home, defendant expressed concern about her daughter, claiming she had not returned home from school, presumably the day before. Defendant told the caseworkers that S.D. was not paying child support, even though she had custody of the children. She acknowledged that there was no "custody agreement." Defendant stated that she was attending counseling and taking prescription medication including Wellbutrin and Zoloft. The caseworkers inspected defendant's home and found it to be "appropriate[,] with no health or safety concerns," and with "adequate food."

DYFS interviewed Samantha on Monday, February 4, at her school. She told the caseworker that she wanted to live with S.D. and that defendant did not provide food and left her home alone. Later that same day, defendant called the Washington Township police to report that S.D. had violated the "restraining order" by picking up Samantha at school. S.D. acknowledged that he had picked up his daughter and taken her to lunch, but that he had already returned her home.

On the night of February 5, S.D. took Neal to the house to gather some belongings; thinking her son was a burglar, defendant called the police, who responded and again notified DYFS. The next day, S.D. explained to DYFS that he had brought Neal to the house to gather some things, was unable to tell defendant beforehand because there was no phone service in the home and defendant had Samantha's cell phone. The caseworker interviewed defendant, who stated that she had taken Samantha's cell phone, and that her daughter threatened "she would tell her principal at school that she was hit with a belt" if the phone was not returned.

On February 19, DYFS interviewed S.D., his girlfriend, and the three children at S.D.'s brother's home. S.D. and his son were sleeping in the living room of the one-bedroom apartment. S.D. told the caseworker that he had paid $5000 for a custody evaluation so that he could obtain full custody of all three children. He claimed that George was already staying with him four to five nights per week, and Samantha, about three nights per week. George, now five years old, told the caseworker that he preferred being at his father's house because there was no food at defendant's home and defendant disciplined the child by hitting him. George also claimed that defendant left him alone at home while she worked and Samantha was at school.

On February 20, the caseworker visited defendant at her home with both Samantha and George present. Defendant was working two days a week as a receptionist and received child support, but claimed that S.D. was "behind in payments." The record contains a print-out DYFS obtained from probation indicating that S.D. was indeed in arrears of his child support payments in the amount of $5010 as of February. Defendant claimed she made ends meet through the help of her parents, who paid for her car and gave her money.[8] Defendant advised that the home was being sold, but claimed there would be little money "left over."

---

[8] The contact sheet refers to the caseworker's conversation with defendant's parents who apparently advised that they had not heard from their daughter for

Samantha told the caseworker that defendant hit her and her siblings "all the time" and that she was "always scared" when she stayed with her mother. Although no physical abuse was confirmed, the caseworker had defendant execute a Case Plan that included, among other suggestions, that defendant "not use [her] stove or oven to heat [her] home at any time."

On March 10, the caseworker visited defendant at home and noticed that although nothing was cooking, the burners on the stove were lit. Defendant explained again that there had been no heat in the home since November 2007, that S.D. was behind in child support, that the family had "[no] television," and that the house was being sold on April 15. DYFS referred defendant to Family Preservation Services (FPS), operated through Catholic Charities.

Samantha claimed that defendant had "ignored her since the last time" the caseworker was there, that defendant continued to use the stove and oven to heat the home, and that there was little food in the home. Both she and George told the caseworker they were scared because their mother was using the oven for heat. A few hours later, the caseworkers returned to see if defendant was still using the stove and oven to heat the house. Defendant became irate and showed them space heaters she was using to heat the house. Later that same evening, Samantha called the caseworker to tell her that defendant was still using the stove and oven to heat the home.

On March 20, 2008, DYFS requested that defendant undergo a risk assessment. She became angry and arrived at the Division's office to speak to a supervisor; a meeting ensued, and defendant was again told that it was hazardous to heat her home with the stove and oven. Because defendant was moving from the house on April 13, 2008, DYFS had her execute an amended Case Plan in which she agreed to have Samantha and George stay with her

months, ever since "they petitioned the court for a mental health evaluation on her." We cannot discern from the record what this remark referenced.

at a friend's house until she could secure "safe and stable housing."

FPS terminated services on March 31. The termination report reveals that defendant had addressed a number of areas of concern. She found housing and had applied for food stamps and daycare for George. Samantha and George indicated that "physical discipline ha[d] stopped in the home." FPS "noticed a correlation between what [S.D.] ... ha[d] been telling DYFS and what [Samantha] ha[d] also [been] saying." Although FPS concluded that defendant "successfully achiev[ed] her goals and [the] risks ha[d] been reduced," it noted several areas of concern, including defendant's "[d]isciplinary [p]ractices," and the "[p]resence of [p]hysical abuse of [the] children."

On April 9, DYFS received a call from Samantha's school counselor stating that the child was afraid to go home fearing that her mother would kill her. Samantha claimed that defendant kept pictures of her daughter on her online My Space page, drawing comments from older men that made the child uncomfortable. Samantha told the caseworker that defendant had not resumed physical discipline, that she and George were still residing with their mother in her friend's home, and that they were planning to move to a new apartment the following day.

The Division then received a call from Samantha's paternal grandmother who was concerned about the child's fears and the appearance of her photos on defendant's My Space page. The grandmother faxed the Division notes regarding a rash she had observed on Samantha's back, as well as copies of defendant's My Space page containing pictures of Samantha, along with comments about the child from defendant's "friend," "Greg."

The following day, April 10, 2008, Samantha's school counselor again called DYFS claiming that Samantha refused to go home because her mother was moving that day, and she was afraid. Samantha also told the counselor that defendant had borrowed her cell phone and refused to return it. The child found it the next morning in defendant's car and it contained "naked pictures of

people ... and possibly white powder (cocaine) on the floor." The school counselor summoned police to the school.

Detective Schott of the Washington Township police reviewed the pictures on Samantha's cell phone and told DYFS that they showed defendant in lingerie and an unknown woman, from the rear, possibly performing fellatio on a man. Schott believed the photos were "not of concern," but it was "inappropriate [for them] to be on [Samantha's] phone." DYFS decided to seek emergency custody of Samantha and George.

S.D. was in California with Neal at the time. DYFS informed him of its plan and asked that he be available by phone for any hearing. Defendant was contacted and told to come to the Division's offices with George. She refused to consent to the emergency removal of Samantha and George from her custody, but provided a urine sample as requested by the Division. The record does not disclose the results of that urine screening. DYFS took Samantha and George to their uncle's home in Chester where their paternal grandmother took custody of them.

(b)

On April 11, 2008, the Division filed its verified complaint against defendant and S.D. seeking emergency custody of Neal, Samantha and George pursuant to Title 9 and Title 30; it contained the events we have detailed above. At a hearing held that day before the same Family Part judge that was handling the parties' divorce, defendant appeared with counsel; S.D. did not appear. The deputy attorney general (DAG) indicated that the Division's plan was to have all three children stay with S.D. upon his return from California. However, she noted that a final domestic violence restraining order against S.D. was still in effect, and he had failed to provide any proof that Neal was being homeschooled.

After the Division's caseworker verified the allegations in the complaint under oath, Schott testified regarding the cell phone photos. The Division's screening summaries, contact sheets and

other documentary evidence were admitted in evidence. Defendant testified regarding the ongoing divorce litigation and noted the "issue of custody [wa]s ... still unresolved[.]" Defendant claimed the children were well-fed, though she admitted that she used the stove to heat her house because the furnace did not work. She further testified that S.D. was responsible for repairing the furnace but refused to do so. Defendant denied ever being diagnosed with any mental illness or being suicidal, but admitted taking Zoloft and Wellbutrin.

Defendant claimed Samantha was extremely unhappy with the new apartment, and, after seeing it for the first time a few days earlier, the child hatched a plan to transfer her custody to S.D. Defendant read a text message from Samantha to S.D.'s girlfriend sent the night before. In it, Samantha told the woman that defendant did not want the child to spend time with her, but "if [Samantha] g[ot] taken away from [defendant], then [defendant] wo[uld]n't have any say."

Reviewing the evidence, the judge observed,

[I]t's just a totality of circumstances that in and of itself would not support the request that's being made by the Division, but I am very concerned about the fact that for some period of time culminating in this week the children do not want to go home. They're scared of their mother. I'm not sure ... other than the corporal punishment that's been described and being left home ... alone and the food issue, I don't think the food issue would rise to that level, but they're scared and I'm not sure I have ... all the reasons as to why they're scared....

....

I'm looking at this ... on a blank slate. I have two children who say they don't want to go home, they're scared of their mother. And a history of corporal punishment, that although [it] was denied today doesn't seem to have been denied according to these records. I don't give a lot of weight to the cell phone pictures....

But I think that the life, safety, or health of the children is in imminent risk if they were to remain home. So they should be removed.

The judge entered an order that granted "legal and physical custody" of the three children to S.D. "on a self-executing basis once he [wa]s in New Jersey," and required S.D. to participate in an anger management program, defendant and S.D. to be evaluated, and all three children to enroll in and attend school.

Status conferences took place in May, June and July and a plethora of problems continued to exist between defendant, S.D., and the children. At the May conference, defendant's conduct during supervised visitation was noted to be problematic, with Samantha, through the law guardian, indicating that she no longer wished to see her mother. S.D. meanwhile had taken all three children out of school and brought them to Georgia for a day so that Neal could compete in a "national [motocross] qualifier." S.D., who was appearing without counsel, disclosed that he "had business plans" that might cause him to relocate out of state, further noting that his attorney had discussed this with the judge "in the FM case." The judge ordered that an evaluation conducted by "Dr. Witt" in the FM matter be released to the psychiatrist and psychologist evaluating defendant and S.D. in this litigation.

During the June conference, the law guardian chastised S.D. for failing to cooperate in setting up counseling for Samantha. The judge was not surprised, noting she had "been involved in this case on more than one level," and that "[i]t's consistent with [S.D.'s] ... conduct." Defense counsel alleged that George was now active in motocross and had suffered bruises as a result. The judge observed, "dad has to understand that if he is not protecting these children's ... life, safety, and health, he's not going to have them.... He's got his own ideas about life, but they may backfire on him.... [H]e's got to act appropriately as a parent, not live vicariously off a five-year-old."

Defendant appeared with new counsel at the July conference. The DAG continued to express concerns about defendant's supervised visitations. She further noted that defendant "completed a psychiatric assessment" that determined her to "be bipolar and borderline personality disorder." The evaluation is not part of the record, and defense counsel disputed these conclusions.[9] The

---

[9] The appellate record contains none of the evaluations performed on defendant, S.D. or the children.

DAG told the judge that DYFS "seem[ed] to be involved in the middle of a custody dispute...."

The DAG also noted that Neal had been excused from school because of a shoulder injury, but, during the same time, had raced in a motocross event. Neal told his therapist that he was "numbed up ... and taped" for each race. The therapist reported "feeling threatened by [S.D.]," and that the family was "being supported by th[e] child's [motocross]." The caseworker furnished a report advising that Neal was having trouble sleeping, was anxious, and had not attended school since the second grade. Although S.D. maintained Neal was being home-schooled, Neal disputed that. The judge emphasized that she had "equal, if not greater concerns about [S.D.'s] conduct with respect to the children" and ordered Neal not to compete in any [motocross] events.[10]

By this time, the parties' divorce had become final. The judge acknowledged that pursuant to a property settlement agreement entered in the divorce action, defendant agreed that her "husband shall have custody of the minor children pursuant to the DYFS order."[11] The July transcript also reveals that S.D. had just recently become employed again after a substantial period of time, that defendant was earning $22,000 per year as a receptionist, that the house in Washington Township had gone through foreclosure and was sold, and that the Internal Revenue Service had filed a $100,000 lien against the parties and their property.

On September 17, 2008, the parties appeared for a fact-finding hearing. After appearances were entered, defendant was immedi-

---

[10] Within a month, the law guardian, with the Division's consent, sought and obtained an order permitting Neal and George to participate in a motocross event. At the time, the Family Part judge overseeing the litigation was on vacation and another judge entered the order.

[11] A final judgment of divorce, dated May 19, 2008, is in the appellate record, and, although it references the property settlement agreement as an exhibit, the agreement itself is not in the record.

ately placed under oath and questioned by her attorney. We quote the exchange at length:

Q. Ms. [D.], I've spoken to you just prior to today's court proceeding. We're here for a fact-finding and also a review. Is that correct?

A. Yes.

Q. You're familiar with the facts of this particular case that's been going on for quite some time?

A. Yes.

Q. And I ... substituted in sometime around July so I haven't been here since the inception of this matter. Is that right?

A. Yes.

Q. Okay. And ... we have a stipulation, that's a legal term which means we're agreeing .. to a particular fact in this case. That's what a stipulation means. I explained that to you?

A. Yes.

Q. And the stipulation to which you are agreeing is that at some point in time, while the children were in your care and custody you ... left the burners on in the oven or the stove to heat the home. Is that correct?

A. Yes.

Q. And a caseworker from DYFS had seen you do that, correct?

A. Yes.

. . . .

Q. And although you have a reason for doing that and that being that the furnace wasn't working you still lit the burners to heat the home knowing that that was not a safe condition for your children and yourself?

A. Yes.

Q. And you were told to leave shortly after doing that and you complied with the request of DYFS. Is that right?

A. Yes.

. . . .

Q. And in fact you've removed yourself from that living condition and you're in other living quarters. Is that right?

A. Yes.

Q. So for all intents and purposes you've corrected that situation and behavior?

A. Yes.

The DAG then questioned defendant.

Q. Ms. [D.], was the date that you left the stove burners and the oven on all night when the Division worker went to the home, was that on or about March of 2008?

A. Yes.

Q. And has anyone forced you or coerced you to make this stipulation?

A. No.

Q. *And are you aware that the Division would have to prove at a trial that they have jurisdiction if you decided not to make this stipulation?*

A. Yes.

Q. Are you under the influence of anything that would impair your judgment today?

A. No.

[Emphasis added.]

The judge then found there was "a factual basis" for the stipulation and that defendant had "conceded voluntarily." She further found that in March 2008,

[A]fter having been told by a Division caseworker that she should not heat the home by turning on ... the burners on the stove, that [defendant] did so anyway, thereby putting the children and ... herself actually at risk.

The judge concluded, "[T]hat's an adequate basis *for establishing the participation of the Division in this matter.*" (Emphasis added). The judge also asked defendant if she was "satisfied with the information and advice given ... by counsel in connection with ... th[e] stipulation," to which defendant responded, "Yes." The dispositional order executed by defendant and her attorney indicated that defendant "knowingly, willingly and voluntarily agreed to waive [her] rights to a Fact Finding Hearing," "admitted to ... le[aving] the burners and oven on in the home to heat the home thus posing a risk to the minor children," and that this "constitute[d] abuse or neglect pursuant to law...." The order further provided, "Defendant ... wa[i]ves the right to an OAL Hearing; The defendant will be maintained as a substantiated perpetrator on the Division's central registry."

Since the children were residing with S.D. in Chester, DYFS asked that the litigation be transferred from Somerset County to Morris County. The law guardian, however, disclosed that S.D. continued to violate the judge's order regarding Neal and George's motocross activities and advised the judge that the children had participated in another event over the past weekend. The DAG responded, "[I]f it continues the Division will be looking to remove the children from him." On October 1, 2008, the judge entered an order transferring the litigation to Morris County.

A compliance hearing in December 2008 again revealed concerns regarding Neal's education. In April 2009, now represented by a third attorney, defendant sought to have the children returned to her. She argued that she had fully complied with all of the Division's recommendations, had secured new housing, obtained medical insurance for the children and found employment. Defense counsel alluded to a number of psychological evaluations that found "no reason for limiting [defendant's] parental rights." The judge concluded that defendant should make a motion to modify the children's custody.

On August 6, 2009, DYFS sought to dismiss the FN litigation, telling the judge that defendant "ha[d] adequately remediated the conditions that led to the children's removal and subsequent Division involvement." DYFS recommended defendant and S.D. share joint legal custody, with S.D. retaining physical custody of Neal, and defendant having physical custody of Samantha and George. The law guardian indicated Samantha and George preferred that their parents share joint physical custody. The judge scheduled another hearing after suggesting that the parties attempt to settle their differences.

A dispositional hearing took place on September 10, 2009. The law guardian explained that no agreement was reached regarding residential custody or parenting time and that the children wished to reside with their father. She further noted that the children were at the courthouse to be interviewed. DYFS did not object. Defense counsel requested that the court interview George but not Neal because his custody was not at issue. Defendant also agreed that the FN litigation should be terminated and conceded that Samantha should be permitted to "decide where she wants to live."

After initially stating that interviewing Neal did not "make much sense," the judge decided to interview both him and Samantha in camera with only the law guardian present. Both expressed a desire to continue to live with S.D. The court declined to interview George and accepted, over defendant's objection, the law

guardian's representation that the child wished to remain in S.D.'s custody. No other testimony was taken and no evidence was adduced at the hearing.

In a brief oral opinion that followed, the judge recognized that defendant's and S.D.'s dispute was "longstanding and they [were] in terrible conflict over the years." He characterized the issue as "a custody-style problem." The judge, noting it was not "sensible to have a full custody battle, or full custody hearing here in . . . this child protective service case," concluded it was "sensible to keep the children together at this juncture." He entered an order terminating the litigation, continuing joint legal custody of the children and awarding S.D. physical custody of all three children.

Defendant moved for reconsideration. In a December 10, 2009 order, the judge denied the request, determining "there [wa]s no reasonable basis to conclude it w[as] in the best interest either of [George] or the other siblings to be separated. . . ." [12] On January 22, 2010, defendant and S.D. entered into a consent order in the FM action transferring residential custody of Samantha to defendant and continuing joint legal custody; this appeal was filed on January 26.

While her appeal was pending, defendant moved to supplement the record. We granted her motion. The supplemental material was a certification from defendant in which she claimed that that she did not abuse or neglect her children, that her trial attorney failed to advise her that by entering the stipulation she was admitting to neglect, and that her attorney did not inform her that the stipulation would cause her name to be entered on the abuse/neglect Central Registry. *See N.J.S.A.* 9:6–8.11. Defendant certified that she would have insisted on a fact-finding hearing if she knew of these consequences, would not have entered the stipulation, and executed the stipulation order simply because she was told to sign it. Defendant further claimed that she was never

---

[12] The record does not contain the motion. It appears there was no oral argument because no transcript has been provided.

advised by anyone that "a finding of abuse or neglect was being entered against her."

## II

### (a)

Defendant argues that her attorney provided ineffective assistance because he essentially consented to a finding of child abuse and/or neglect, even though the conduct that she admitted, i.e., using the stove and oven to heat her home, did not violate *N.J.S.A.* 9:6–8.21(c). Defendant also contends that counsel was ineffective because he failed to specifically advise her that the stipulation was an acknowledgment that she had abused or neglected her children. Lastly, defendant argues that counsel was ineffective because he failed to inform her that the stipulation "would cause her name to be entered on the State Central Registry."

The Division urges us to reject defendant's claim of ineffective assistance without any remand. It contends that trial counsel's performance was not "objectively deficient" because defendant's answers to the questions posed, and the executed stipulation itself, belie her claim that she was unaware of the significance and consequences of the stipulation. Additionally, DYFS and the law guardian argue that despite the finding of neglect based upon defendant's stipulation, no "actual prejudice has befallen" defendant, although they concede that her name is now entered in the Central Registry as a result.

 Parents are entitled to the effective assistance of counsel in termination proceedings. *N.J. Div. of Youth & Family Servs. v. B.R.*, 192 *N.J.* 301, 305–07, 929 *A.*2d 1034 (2007). In *B.R.*, the Court adopted the two-prong test set forth in *Strickland v. Washington*, 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984), and adopted in *State v. Fritz*, 105 *N.J.* 42, 519 *A.*2d 336 (1987), whenever assessing a claim of ineffective assistance of counsel in such litigation. *B.R., supra*, 192 *N.J.* at 308–09, 929 *A.*2d 1034. In short, to succeed the defendant must demonstrate: "(1) coun-

sel's performance [was] objectively deficient—i.e., it ... [fell] outside the broad range of professionally acceptable performance; and (2) counsel's deficient performance ... prejudice[d] the defense—i.e., there [was] 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Id.* at 307, 929 *A.*2d 1034 (quoting *Strickland, supra,* 466 *U.S.* at 694, 104 *S.Ct.* at 2068, 80 *L.Ed.*2d at 697). The Court "direct[ed] that claims of ineffective assistance ... be raised on direct appeal." *B.R., supra,* 192 *N.J.* at 311, 929 *A.*2d 1034; *see R.* 5:12–7 (providing that claims of ineffective assistance "shall be raised exclusively on direct appeal"). "In many cases, the issue will be resolvable on the appeal record alone." *B.R., supra,* 192 *N.J.* at 311, 929 *A.*2d 1034.

 In *B.R., supra,* the defendant did not stipulate to a finding of abuse or neglect at a fact-finding hearing. 192 *N.J.* at 303–04, 929 *A.*2d 1034. We have said that "[a] 'fact-finding hearing is a critical element of the abuse and neglect process,' because the court's 'determination has a profound impact on the lives of families embroiled in this type of a crisis.' " *N.J. Div. of Youth & Family Servs. v. I.Y.A.,* 400 *N.J.Super.* 77, 87–88, 946 *A.*2d 62 (App.Div.2008) (quoting *N.J. Div. of Youth & Family Servs. v. J.Y.,* 352 *N.J.Super.* 245, 264–65, 800 *A.*2d 132 (App.Div. 2002)). When entering a factual stipulation as to a finding of abuse or neglect, the stipulation must contain *definite terms* and the party's consent to enter into it must be clearly established. *J.Y., supra,* 352 *N.J.Super.* at 265–66, 800 *A.*2d 132 (emphasis added). In order to accept a stipulation,

> the judge must be satisfied that there is a factual basis from which to conclude that defendant[ ] ha[s] committed some specific act or acts which constitute abuse or neglect as defined in *N.J.S.A.* 9:6–8.21(c) and that the parent[ ] willingly, knowingly and voluntarily agree[s] that [she] ha[s] committed these acts.
>
> . . . .
>
> Furthermore, like waivers in other legal settings, the judge hearing an abuse and neglect case, before accepting a defendant's stipulation in lieu of a fact-finding hearing, must first determine that the waiver involved "the intentional relinquishment of a known right ... evidence[d] by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based."

[*Id.* at 266, 800 *A.*2d 132 (quoting *Country Chevrolet v. N. Brunswick Planning Bd.,* 190 *N.J.Super.* 376, 380, 463 *A.*2d 960 (App.Div.1983)).]

"*The judge must also directly apprise defendant[ ] of [her] rights under Title 9 to a fact-finding hearing where the burden of proof will be on DYFS to establish the elements of abuse and neglect by a preponderance of the evidence.*" *J.Y., supra,* 352 *N.J.Super.* at 266, 800 *A.*2d 132 (emphasis added) (citing *N.J.S.A.* 9:6–8.46(b)).

■ Our review of the transcript convinces us that neither defense counsel, nor the judge, ever advised defendant that by stipulating to certain facts—using the stove to heat her home after being advised not to do so by DYFS—she was admitting to the abuse and/or neglect of her children. Indeed, the entire proceeding was bereft of any mention of the terms "abuse or neglect."

Defense counsel only elicited from defendant her understanding that she was in court for "a fact-finding and also a review"; that she understood a stipulation was "a legal term" by which she was "agreeing . . . to a particular fact," i.e., "that at some point in time while the children were in [her] care and custody [she] . . . left the burners on in the oven or the stove to heat the home"; that she knew this was "not a safe condition for [her] children"; that she "complied with the request of DYFS" and "removed [herself] from that living condition"; and that "for all intents and purposes" she had "corrected that situation and behavior[.]" The DAG only questioned defendant regarding when this had occurred; whether "anyone forced . . . or coerced [defendant] to make th[e] stipulation"; her understanding that DYFS "would have to prove at a trial . . . jurisdiction if [she] decided not to make th[e] stipulation[ ]"; and that defendant was not "under the influence of anything that would impair [her] judgment."

■ Before the stipulation was entered, the judge did not "directly apprise defendant[ ] of [her] rights under Title 9 to a fact-finding hearing where the burden of proof [would have been on] DYFS to establish the elements of abuse and neglect by a preponderance of the evidence." *J.Y., supra,* 352 *N.J.Super.* at 266, 800 *A.*2d 132. The judge's inquiry after the stipulation was

quite limited, asking defendant only if she was satisfied with her attorney's representation. In accepting defendant's factual basis, the judge never stated that the stipulated facts were adequate to prove defendant had abused or neglected her children under the standards contained in *N.J.S.A.* 9:6–8.21(c), and never used the terms abuse or neglect. Instead, the judge only announced that the stipulated facts provided "an adequate basis for establishing the participation of the Division." The DAG's use of the term "jurisdiction," and the judge's determination that the facts "establish[ed] [grounds for] the participation of" DYFS, inadequately conveyed the essential legal consequence of defendant's stipulation—that defendant was admitting to having abused or neglected her children.[13]

Although the dispositional order may have addressed some of these deficiencies, it did not cure them. We acknowledge, for example, that the order advised defendant that she had "waive[d] [her] rights to a Fact Finding Hearing at which the Division would have the burden of proof." But it did not advise defendant that DYFS had to prove that she abused or neglected her children, as those terms are defined by statute.

The order provided that defendant was waiving her "right to an OAL Hearing," and that her name would "be maintained as a substantiated perpetrator on the Division's central registry." It did not, however, explain defendant's rights in this regard, nor did it explain the consequences of the entry of her name on the Registry. We have noted that "[t]he impact of the Registry is substantial[,]" and "[t]he entry of an individual's name on the

---

[13] The use of these terms may be adequate in the context of a Title 30 proceeding where "the best-interests standard" applies, and where a finding of abuse and/or neglect is not necessary for DYFS to exercise its jurisdiction. *N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 292, 914 *A.2d* 1265 (2007). "It is well settled that, unlike Title 9 inquiries, a parent's fitness is not the touchstone under the best-interests standard." *Ibid.;* see also *N.J. Div. of Youth & Family Servs. v. N.D.*, 417 *N.J.Super.* 96, 112–14, 8 *A.3d* 809 (App.Div.2010) (explaining the differences between the two statutory schemes).

Central Registry gives rise to a significant liberty interest on the part of that individual." *N.J. Div. of Youth & Family Servs. v. V.M.*, 408 *N.J.Super.* 222, 237–38, 974 *A.*2d 448 (App.Div.) (Carchman, concurring), *certif. denied,* 200 *N.J.* 505, 983 *A.*2d 1113 (2009), *certif. denied,* 201 *N.J.* 272, 989 *A.*2d 1264 (2009), *cert. denied, V.M. v. N.J. Div. of Youth & Family Servs.,* —— *U.S.* ——, 130 *S.Ct.* 3502, 177 *L.Ed.*2d 1095 (2010). Under this context and without any other explanation provided in the record, defendant's execution of the stipulation order, standing alone, failed to adequately apprise her of the consequences of the entry of her name on the Central Registry resulting from her stipulation.

By executing the order, defendant acknowledged that her use of the oven "pos[ed] a risk to the minor children," and that this "constitute[d] abuse or neglect pursuant to law. . . ." However, we do not deem that to be adequate. In all likelihood, the dispositional order was executed *after* the proceedings ended.[14] Certainly, the record lacks any indication that defense counsel or the judge explained the significance of the terms contained in the order to defendant *before* she made her statements under oath. Moreover, defendant has certified that her attorney only told her to sign the order without explaining it to her.

In short, at a minimum, defense counsel was obligated to clearly and unequivocally advise defendant that she would be deemed to have committed child abuse and/or neglect once she admitted to certain facts. Given the significant inadequacies of the proceedings in this regard, counsel's performance was objectively deficient. Defendant has established the first prong of the *Strickland/Fritz* test.

 Although we recognize the inherent differences between claims for post-conviction relief in criminal cases, and claims of ineffective assistance of counsel in Title 9 and Title 30 litigation,

---

[14] The order contains the handwritten facts that defendant admitted at the hearing, i.e., that she "left the burners and oven on in the home to heat the home thus posing a risk to the minor children."

we analogize the circumstances presented here to those that exist when a criminal defendant asserts a claim of ineffective assistance of counsel after entering a guilty plea. In that context, "[t]he second part of the test for ineffective assistance of counsel is whether 'there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial.'" *State v. Nunez–Valdez*, 200 *N.J.* 129, 142, 975 *A.*2d 418 (2009) (quoting *State v. DiFrisco*, 137 *N.J.* 434, 457, 645 *A.*2d 734 (1994)(in turn quoting *Hill v. Lockhart*, 474 *U.S.* 52, 59, 106 *S.Ct.* 366, 370, 88 *L.Ed.*2d 203, 210 (1985))).

██ Here, defendant claims that had she known of the conse-quences of entering the stipulation, she would have insisted on a fact-finding hearing, i.e., she "would have insisted on going to trial." Given the allegations actually made against her in the complaint, and the totality of the circumstances regarding her tumultuous relationship with S.D., her assertion is objectively reasonable.

We understand that without the stipulation being entered, DYFS may have marshaled more extensive testimony regarding its involvement with defendant and the D. family. In our view, however, the record before us presents an equivocal picture as to whether defendant had indeed committed abuse or neglect of her children.

Allegations of physical discipline were made by the children to the police, DYFS, health care providers, and school counselors under circumstances that suggested S.D. had coached the chil-dren. Further, the reports grew out of a bitter custody dispute in which Samantha told DYFS that each parent tried to get the children to "say things against the other parent," and S.D. re-peatedly evidenced his intention to secure custody of all three children. In the end, after the Division's investigation every claim of physical abuse was unsubstantiated.

Allegations of defendant's neglect were also frequently unfound-ed. Despite the children's claims that defendant failed to feed

them or have adequate food in the house, actual inspections of the home conducted by DYFS painted a different picture. While defendant improvidently used her stove and oven to heat her home, we are mindful of the circumstances that existed at the time. S.D. was in arrears of his child support and refused to provide any funds to repair the furnace. The house was in foreclosure. At the same time, S.D. was vacationing in Bermuda with his two sons and traveling around the country so that Neal could participate in motocross events.

At the time of the fact-finding hearing, defendant had re-located to an apartment that was adequate for her needs and those of her children. She was employed and was attending counseling. S.D., who we note was still a named defendant in the litigation, was residing in his brother's one-bedroom apartment with Neal, was apparently unemployed and was allegedly living off his son's motocross earnings. In clear violation of court orders, S.D. failed to document his son was being home-schooled.

In short, we will not presume the outcome that may have resulted from a full-fledged fact-finding hearing.[15] We only conclude that defendant has demonstrated a reasonable probability that had she known the full consequences of her stipulation, she would have proceeded and insisted that DYFS prove her actions

---

[15] Defendant contends that as a matter of law, she was not guilty of child neglect, citing *N.J.S.A.* 9:6–8.21(c)(4), which provides that a neglected child is one "whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure ... to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care *though financially able to do so* or though offered financial or other reasonable means to do so...." (*Emphasis added*). "[M]inimum degree of care" refers to grossly negligent conduct, or actions committed with reckless disregard of the safety of others. *G.S. v. Dep't of Human Servs., N.J. Div. of Youth & Family Servs.*, 157 *N.J.* 161, 178–79, 723 *A.*2d 612 (1999). Defendant contends that because S.D. was in arrears of his child support, she was not "financially able" to heat her home and that her conduct did not amount to gross negligence or reckless disregard of her children's welfare. We need not decide the issue in light of our holding.

amounted to child abuse or neglect. Thus, defendant meets the second prong of the *Strickland/Fritz* test.

Under these circumstances, there is no need to remand the matter for an evidentiary hearing on defendant's claim. From the record presented, we conclude that defense counsel provided ineffective assistance by failing to insure that defendant received the minimal protections she was entitled to during this "critical stage" of the proceedings. *See N.J. Div. of Youth & Family Servs. v. G.M.*, 198 *N.J.* 382, 401, 968 *A.2d* 698 (2009). We therefore reverse the September 17, 2008 order.[16]

### (b)

Because of the frequency with which issues surrounding stipulations at fact-finding hearings present themselves despite our holding in *J.Y.* nearly eight years ago, we provide some additional guidance.[17] First, we reiterate our recognition of the utility of

---

[16] As a result, defendant's Point V is moot.

[17] *See e.g.*, *N.D.*, *supra*, 417 *N.J.Super.* 96, 113–14, 8 *A.3d* 809 (App.Div.2010) (stating that the stipulation involved was "inadequate"). The following cases are "unreported" and therefore "ha[ve] no precedential value." *R.* 1:36–3. They are, nonetheless, instructive as to the frequency with which these issues arise. *N.J. Div. of Youth & Family Servs. v. M.C.*, No. A–2030–09T3, No. A–2095–09T3, 2010 *WL* 4702338 (App.Div. Nov. 22, 2010) (slip op. at 33) (finding the stipulation to be adequate because defendant "specifically stipulated 'that her actions directly put [the child] at substantial risk of harm ... constitut[ing] abuse or neglect pursuant to law' " and was thereby " 'definite and certain in its terms' ") (citing in part *J.Y.*, *supra*, 352 *N.J.Super.* at 265, 800 *A.2d* 132); *N.J. Div. of Youth & Family Servs. v. C.W.*, No. A–5074–08T4, 2010 *WL* 4074944 (App.Div. June 8, 2010) (slip op. at 14) (remanding on the basis that the stipulation may have been invalid because the judge "presum[ed] ... parental unfitness" without fully ascertaining the "manner in which [defendant's] behavior caused harm to her [children]"); *N.J. Div. of Youth & Family Servs. v. M.M.B.*, No. A–3359–07T4, No. A–2034–08T4, 2009 *WL* 3429580 (App.Div. Oct. 27, 2009) (slip op. at 15–16) (rejecting defendant's argument that her counsel was ineffective because the stipulation of "abuse and neglect was based on [her] drug usage and not any other conduct" and there was "no [other] evidence ... contradicting th[at] stipulation"); *N.J. Div. of Youth & Family Servs. v. K.K.*, No. A–1358–08T4, 2009 *WL* 1514957 (App.Div. June 2, 2009) (slip op. at 11) (dismissing defendant's claim of ineffective assistance of counsel because she failed to "address why, in a

stipulations in this context. "As a general proposition, stipulations permit parties in a civil case to agree on relevant facts, thereby narrowing the area of dispute requiring the production of evidence and promoting the efficient administration of justice." *J.Y., supra,* 352 *N.J.Super.* at 265, 800 *A.2d* 132 (citations omitted).[18]

Unlike other "civil case[s]," however, the parental rights implicated in Title 9 litigation "are constitutionally protected [although] not absolute." *N.D., supra,* at 108, 8 *A.*3d 809 (citing *G.M., supra,* 198 *N.J.* at 397, 968 *A.*2d 698). "Parents' rights must be balanced against the State's *parens patriae* responsibility to protect the welfare of children." *N.D., supra,* 417 *N.J.Super.* at 109, 8 *A.*3d 809 (quotations omitted). "When that balancing is required, a court must ensure that the statutory and constitutional rights of the parent or guardian are scrupulously protected." *Ibid.* (quotation omitted).

Therefore, before a stipulation is accepted at a fact-finding hearing, DYFS, after consultation with defense counsel, should advise the judge which specific provision of *N.J.S.A.* 9:6–8.21(c) is expected to be proven by way of defendant's stipulated facts. The judge must then explicitly inform the defendant: that by agreeing to enter into a stipulation, she is waiving her right to

---

fact-finding hearing, the judge would not have made the same finding she stipulated to" in spite of her counsel's performance); *N.J. Div. of Youth & Family Servs. v. J.F.,* No. A–1846–07T4, 2009 WL 509780 (App.Div. Mar. 3, 2009) (slip op. at 5) (accepting defendant's stipulation after judge "stated on the record that ... [defendant's] ... act[ions] or admissions constitute abuse or neglect").

18 Indeed, our courts have also recognized the utility of stipulations in criminal and quasi-criminal matters. *See, e.g., R.* 3:9–2 (permitting the court, "[i]n addition to its inquiry of the defendant, ... [to] accept a written stipulation of facts, opinion, or state of mind that the defendant admits to be true, provided the stipulation is signed by the defendant, defense counsel, and the prosecutor"); *and see State ex rel. T.M.,* 166 *N.J.* 319, 330, 765 *A.2d* 735 (2001) (where, in a juvenile delinquency proceeding, the Court "acknowledge[d] the usefulness of trials on stipulated facts, ... [but] limited the use of such a process to situations in which there is an initial demonstration on the record that the defendant is engaging in the stipulated-facts trial voluntarily and knowingly").

a hearing at which DYFS must prove abuse or neglect by a preponderance of the evidence, *J.Y., supra,* 352 *N.J.Super.* at 266, 800 *A.2d* 132; that at such a hearing, the judge would determine what documentary evidence and testimony would be admitted, and that defendant, through counsel, would have the right to challenge the evidence and cross-examine the witnesses, *Id.* at 265, 800 *A.2d* 132; that if the judge accepts defendant's stipulated facts and concludes they demonstrate abuse and/or neglect, the judge will enter an order finding that defendant has abused and/or neglected her child; and, that as a result of that order, DYFS may seek termination of the defendant's parental rights, and the judge may remove, or continue the removal of, the child from the defendant's custody, *N.J.S.A.* 9:6–8.50(d), and/or require DYFS to "provide such services as are deemed appropriate to the ends of protecting the child and rehabilitating and improving family life," *N.J.S.A.* 9:6–8.50(e).

▮▮ Additionally, we have noted the "numerous collateral consequences [that] flow from such a finding [of abuse or neglect]." *N.J. Div. of Youth & Family Servs. v. N.S.,* 412 *N.J.Super.* 593, 619, 992 *A.2d* 20 (App.Div.2010).

> Specifically, a finding of abuse and neglect is forwarded by the Division to a central registry maintained by the Department of Children and Families (DCF). On written request, the records may be released to individuals identified in the statute, including doctors, courts, child welfare agencies, and any person or entity mandated by statute to consider child abuse or neglect information when conducting a background check or employment-related screening of an individual ... seeking employment with an agency or organization providing services to children[.]
>
> [*Id.* at 619–20, 992 *A.2d* 20. (citations omitted) (quotations) ].

Therefore, the judge should advise the defendant that as a result of a finding of abuse and/or neglect, the defendant's name shall remain on the Central Registry of confirmed perpetrators, and that defendant is waiving any ability, either through the administrative process or through the proceedings in court, to challenge the inclusion of her name on the Central Registry.

▮▮ Requiring the judge to conduct this inquiry of defendant on the record may be time-consuming, or even a daunting endeav-

or. On occasion, as sometimes occurs in the criminal context, a defendant may be unwilling to acknowledge and accept that his or her actions amounted to a violation of law—the abuse and/or neglect of their own child. Yet, when constitutional rights are at stake, nothing less than procedures that "scrupulously protect[ ]" those rights are required. *N.D., supra,* 417 *N.J.Super.* at 109, 8 *A.*3d 809.

In the criminal context, our courts have imposed long-standing obligations on the judge to ensure that a criminal defendant's guilty plea was voluntarily entered with full understanding of the nature of the charge. *State v. Reali,* 26 *N.J.* 222, 224, 139 *A.*2d 300 (1958). For years, our *Rules of Court* have required a criminal defendant to execute a written form acknowledging an understanding of the consequences of his guilty plea and the rights he was waiving as a result of pleading guilty. *See State v. Deutsch,* 34 *N.J.* 190, 201, 168 *A.*2d 12 (1961) (discussing the significance of the plea form then mandated by *Rule* 3:5–2(b)); *and see R.* 3:9–2 (providing that in accepting the defendant's guilty plea, "the court shall require the defendant to complete ... and sign the appropriate form prescribed by the Administrative Director of the Courts"). Our *Rules of Court* have mandated such a form be used in juvenile delinquency proceedings. *See R.* 5:21A. The current "Children in Court Case Processing Manual," issued by the Administrative Office of the Courts to all trial judges involved in Title 9 and Title 30 litigation, now contains a form to be used whenever a defendant voluntarily surrenders his or her parental rights.

Whenever a defendant was entering a stipulation at a fact-finding hearing, a similar form would assist the judge in making the necessary finding that the defendant was entering into the stipulation with full and complete understanding of his or her rights, that he or she was waiving those rights, that he or she understood the consequences of the stipulation, and that he or she was entering into the stipulation "willingly, knowingly and voluntarily." *J.Y., supra,* 352 *N.J.Super.* at 266, 800 *A.*2d 132. We

therefore refer this matter to the Supreme Court's Committee on Practice in the Family Part, and the Acting Administrative Director of the Courts, so that they may consider our suggestions.

## III

In Points II, III, and IV, defendant claims a remand is necessary because the dispositional hearing conducted by the second judge applied the "best interests" standard, contrary to the Court's holding in *G.M., supra,* 198 *N.J.* at 402, 968 *A.*2d 698; because the interview of the two children was "inadequate" in that the judge did not permit counsel "to submit questions pursuant to *R.* 5:8–6," and did not provide defendant with "an opportunity to answer the issues raised in the interview"; and because hearsay evidence was admitted at the dispositional hearing. At oral argument before us, DYFS conceded that the second judge in this case applied the wrong standard to decide which parent should maintain residential custody of George. The Division, however, argues that defendant can seek a change in custody under the FM docket, noting that she and S.D. have negotiated a consensual change in Samantha's custody since the dispositional order was entered.

In *G.M., supra,* 198 *N.J.* at 402, 968 *A.*2d 698, the Court held that before Title 9 litigation is dismissed, the judge must conduct a dispositional hearing. *See N.J.S.A.* 9:6–8.45 and –8.50. "[T]he central question in a Title 9 dispositional hearing is whether the child may be safely returned to the custody of the parent from whom the child was removed." *N.D., supra,* 417 *N.J.Super.* at 107, 8 *A.*3d 809 (citing *G.M., supra,* 198 *N.J.* at 402, 968 *A.*2d 698). The focus should not be "on the wishes of the children," but rather "on whether the children c[an] be safely returned to the custody of the[ ] [offending parent]." *G.M., supra,* 198 *N.J.* at 402, 968 *A.*2d 698.

However, "an order of disposition placing a child with a person other than the parent from whose custody the child was

removed may be entered pursuant to *N.J.S.A.* 9:6–8.51 only if there is first a finding of abuse or neglect." *N.D., supra*, 417 *N.J.Super.* at 110, 8 *A.*3d 809. Since we have reversed the order finding that defendant had neglected her children, the issue is moot.

However, we recognize that S.D. has maintained residential custody of George since the Dodd hearing more than thirty months ago. We also know that thereafter, the parties entered into a property settlement agreement that included terms regarding the children's custody. Specifically, defendant agreed that S.D. should have custody of all three children. We do not know what has transpired in the year since the dispositional order was entered, except that the parties agreed residential custody of Samantha should return to defendant. Under the circumstance, "[t]o avoid undue disruption [to George], we continue the present order until modified by the trial judge." *Id.* at 114, 8 *A.*3d 809.

No later than February 25, 2011, DYFS shall determine whether it wishes to proceed in the Title 9 litigation or dismiss its complaint. If the Division opts to continue, the judge shall, upon notice to defendant and her counsel, and S.D. and his counsel, schedule a fact-finding hearing. *Ibid.* The necessity of a dispositional hearing shall abide the results of that fact-finding hearing.

If the complaint is dismissed by DYFS or the judge following the fact-finding hearing, residential custody of George shall remain with S.D. pursuant to the dispositional order which shall then be entered pendente lite under the FM docket. Thereafter, "proceedings should be scheduled to resolve the custody issues in accordance with the *Rules of Court* and *N.J.S.A.* 9:2–4," and the parties may attempt to "resolv[e] the questions of custody and parenting time by agreement." *Id.* at 115, 8 *A.*3d 809. At the custody hearing, "absent a finding of abuse or neglect in the Title 9 action, [defendant] cannot be burdened by assumptions about her parental fitness based on the prior orders entered in this litigation." *Ibid.*

Reversed and remanded for proceedings consistent with this opinion. We do not retain jurisdiction.