# RECORD IMPOUNDED

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3349-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

D.P.-Z.[1] and S.E.Z.,

     Defendants-Respondents.

_____

IN THE MATTER OF
MA.Z. and MI.Z., minors,

and

MIL.Z., minor,

     Appellant.

_____

<div style="border:1px solid black; display:inline-block;">

**APPROVED FOR PUBLICATION**

**February 13, 2026**

**APPELLATE DIVISION**

</div>

Argued January 6, 2026 – Decided February 13, 2026

Before Judges Gilson, Firko, and Perez Friscia.

---

[1]  We use initials and fictitious names for the parents and children to protect their privacy and the confidentiality of the record.  R. 1:38-3(d)(12).

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FN-04-0199-23.

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minor-appellant Mil.Z. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the briefs).

Meaghan Goulding, Deputy Attorney General, argued the cause for respondent New Jersey Division of Child Protection and Permanency (Matthew J. Platkin, Attorney General, attorney; Donna Arons, Assistant Attorney General, of counsel; Jessica A. Prentice, Deputy Attorney General, on the brief).

John A. Albright, Assistant Deputy Public Defender, argued the cause for respondent D.P.-Z. (Jennifer N. Sellitti, Public Defender, attorney; John A. Albright, of counsel and on the brief).

T. Gary Mitchell, Deputy Public Defender, argued the cause for respondent S.E.Z. (Jennifer N. Sellitti, Public Defender, attorney; T. Gary Mitchell, of counsel and on the brief).

Cory H. Cassar, Designated Counsel, argued the cause for minors Ma.Z. and Mi.Z. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, on the brief).

The opinion of the court was delivered by

PEREZ FRISCIA, J.A.D.

2

Appellant Mil.Z. (Mary) appeals from the April 30, 2024 Family Part order denying her a Title 9, N.J.S.A. 9:6-8.21 to -8.73, abuse or neglect hearing after she, as the child subjected to the alleged abuse or neglect, objected to the trial court's acceptance of the New Jersey Division of Child Protection and Permanency's (Division) settlement with defendants D.P.-Z. (Dawn) and S.E.Z (Sara) to an "established" abuse or neglect finding pursuant to N.J.S.A. 9:6-8.21(c)(4). Mary also appeals from the trial court's companion order denying her a plenary hearing on sibling visitation and best interests evaluations. The Law Guardian for Mary's siblings, Ma.Z. (Maya) and Mi.Z. (Mindy), urges us to reject Mary's arguments and affirm the court's orders.

We hold the trial court was permitted to accept the Division's Title 9 settlement with Dawn and Sara over Mary's objection, but we reverse and remand for further proceedings because the court failed to make sufficient factual findings regarding Dawn's and Sara's stipulated abuse or neglect. Further, we conclude the court improperly denied Mary's request for sibling visitation under the Child Placement Bill of Rights Act (CPBRA), N.J.S.A. 9:6b-1 to -6, and the Siblings' Bill of Rights (SBR), L. 2023, c. 1, §§ 1-3 (codified at N.J.S.A. 9:6B-2.1 to -2.2 and amending N.J.S.A. 9:6B-4). Mary had the presumptive right to sibling visitation under the CPBRA and the SBR and made a prima facie showing of resulting harm from the denial of visitation

3                                                                    A-3349-23

to her and her two siblings. Therefore, the court improvidently disregarded Mary's request and the Division's multiple recommendations for sibling visitation, failed to adequately address Mary's presumptive right to sibling visitation, and should have ordered best interests evaluations to address visitation. For these reasons, we reverse and remand for further proceedings.

I.

We summarize the pertinent facts and procedural history from the record. In 2018, the Division received multiple referrals regarding the biological parents of Mary (born in August 2009), Maya (born in May 2016), and Mindy (born in July 2017). After the Division conducted an investigation and removal of the siblings, it was determined the siblings' biological parents had substance abuse issues, and the siblings witnessed domestic violence. After their removal, the siblings resided in a foster home and later with an aunt. Maya was diagnosed with autism spectrum disorder and is minimally verbal. The siblings' aunt ultimately could not provide for the siblings. The biological parents' rights were terminated.

On December 16, 2020, Dawn and Sara (the parents) adopted the siblings through the Division. The siblings resided together with their adoptive mothers.

Between July 1, 2022 and January 27, 2023, the Division received ten referrals regarding Dawn's and Sara's care of the children, primarily related to Mary. The parents allegedly: physically abused Mary; overmedicated and sedated Maya; called Mary derogatory names; threatened Mary with a gun; repeatedly denied Mary food; forced Mary to sleep in an unfurnished room without a mattress; refused to provide Mary with menstrual sanitary products; forced Mary to wait outside in the cold; and left Mary in their bathroom naked overnight. Dawn and Sara alleged Mary had "threatened the other children in the home," "was out of control," and "pushed her younger sister down the stairs." Mary denied the parents' allegations.

On January 27, 2023, a Division caseworker visited the family's home after a hospital professional reported Mary may have been physically abused. Police transported Mary to the emergency room after she had "a psychiatric episode." Mary reported that her parents "held her down, kick[ed] and punch[ed] her in the stomach," and forcibly confiscated a friend's cell phone that she was given to record their actions. Dawn and Sara admitted to restraining Mary but maintained there was no physical harm. After interviewing Mary, Dawn, and Sara, the caseworker determined the Division had to remove Mary given her injuries—a bruise and scratches—and because the Division had concerns of "on[]going abuse." The same day, the Division

placed Mary with her biological aunt, T.K. (Tia). The caseworker did not remove Maya or Mindy from the home, finding no concerns for their welfare.

On January 31, 2023, the Division filed a verified complaint and order to show cause seeking the continued custody, care, and supervision of Mary, as well as the care and supervision of Maya and Mindy. The court granted the Division's requests with the parents' consent, appointed a Law Guardian for Mary, and appointed a separate Law Guardian for Maya and Mindy.

At the hearing, the court ordered the following: the parents to complete psychological evaluations and follow all recommendations; "the Division to assess any potential needs of [Maya and Mindy]"; and Mary to complete a psychiatric evaluation and a physical examination through the NJ Cares Institute (NJ Cares). Also, the court denied Mary's Law Guardian's request for sibling visitation based on Maya and Mindy's Law Guardian's request to postpone sibling visitation because of their "special needs," and the belief that visits "would be very confusing for them."

On March 13, 2023, NJ Cares physician Stephanie V. Lanese, M.D., conducted Mary's physical evaluation. Mary told Dr. Lanese that Dawn and Sara treated her siblings "just fine." Mary, however, also reported that Dawn would "get mad at" Maya, "scream at her, and hit [Maya] with her hand." Mary relayed that if Dawn and Sara "[we]re doing [Mindy's] hair and she

A-3349-23

[wa]s not sitting still, they w[ould] hit her with her brush." Dr. Lanese concluded that Mary's history "[wa]s both consistent with a medical diagnosis of excessive corporal punishment and physical abuse, as well as neglect and failing to provide her with basic needs" and "routine medical care."

Later in the same month, during the court's case management conference, the Division advised the court that the parents' services were being held in abeyance until the Division's administrative investigation concluded. Mary's Law Guardian requested sibling visitation. Maya and Mindy's Law Guardian argued "to leave it at status quo" and deny sibling visitation. She relayed Mindy had expressed concerns about Mary and was "afraid of her." The court ordered that Mary receive photographs of her siblings.

On March 29, 2023, Dr. Deborah Mulgrew, an adolescent psychiatrist, performed an evaluation of Mary. Dr. Mulgrew noted that Dawn and Sara wanted Mary to be "disconnected from the family entirely with no contact with the sisters," despite Mary's "hop[es] to re-establish . . . [sibling] contact." Notably, Dr. Mulgrew recommended the court consider sibling visitation, "as they have been long-term bonded to each other and spent most of their entire lives together." Dr. Mulgrew suggested "visits may be supervised by an independent party to quell some of the adoptive parents' fears about [Mary's] influence on the younger children."

A-3349-23

Mary reported to Dr. Mulgrew that "at times[,] she fe[lt] sad and depressed, but it ha[d] to do with not having contact with her sisters." Mary explained that after moving out of her adoptive parents' home, her mood had improved, and she was seeing a new therapist. Dr. Mulgrew diagnosed Mary with the following: "post-traumatic stress disorder" resulting from "exposure to both physical and emotional abuse, in biological and adoptive homes, separation from biological sisters and loss of contact with biological family, [and] exposure to domestic violence"; "adjustment disorder with disturbances in mood and conduct" that was "resolving"; oppositional defiant disorder; and a history of mild attention deficit hyperactivity disorder. Dr. Mulgrew recommended individual therapy, psychopharmacologic intervention, and that Mary remain with Tia.

On May 10, 2023, the Division submitted a report to the court with Dr. Mulgrew's evaluation attached. In the report, the Division recommended sibling visitation. At a May 12, 2023 fact-finding hearing, the Division stated it substantiated abuse against Dawn and Sara, and it would proceed under Title 9 against both parents "for excessive corporal punishment," "physical abuse," and "psychological harm to [Mary]." The court adjourned the trial, determined it had jurisdiction under Title 30, and found the family was in "need of services." Mary's Law Guardian again requested sibling visitation, citing Dr.

8

Mulgrew's evaluation. Maya and Mindy's Law Guardian opposed the request, relaying the siblings were "somewhat afraid," and alleging Mary had "acted out against the girls at times[,] and things [we]re just settling down in the home." She also expressed that Maya would not benefit from Mary's visits because Maya is "severely autistic and . . . non-verbal." Maya and Mindy's Law Guardian requested "an opportunity to get a therapist" on her clients' behalf to determine if sibling visitation was in their best interests. The court denied Mary's Law Guardian's visitation request.

On May 26, 2023, the Division filed an amended complaint, incorporating Dr. Lanese's and Dr. Mulgrew's findings, as well as another abuse referral made by a school employee against the parents concerning Mary. Dawn told Mindy's Division caseworker that Mindy began therapy in early June 2023. Dawn refused further counseling for Mindy. On July 11, 2023, Mindy's therapist wrote a letter confirming Mindy was an "active client" and had attended four sessions.

At a July 14, 2023 case management conference, the court ordered the parents to sign a release for the Division to communicate with Mindy's therapist regarding sibling visitation. The Division submitted its June 28, 2023 report, which once again recommended sibling visitation and counseling for Mindy. Maya and Mindy's Law Guardian argued against starting sibling

visitation because she had not "spoken[ to] or . . . gotten anything" from Mindy's therapist. Maya and Mindy's Law Guardian believed that sibling visitation was not in Maya's best interests because Maya is "severely autistic and non-verbal, . . . one of her parents would have [had] to be with her[,] and it complicate[d] the matter with the placement of [Mary]."

The next month, the Division submitted its report, containing multiple recommendations for the court to order: an NJ Cares evaluation of Maya and Mindy, that the parents sign a release for Mindy's therapist's reports, and sibling visitation. At the August 25, 2023 case management conference, the Division reported that the parties were attempting to settle the Title 9 matter, and the Division had obtained a signed release for Mindy's therapist's records. The court ordered Mary to be given updated photographs of her siblings "on a monthly basis," noting issues with Mary's receipt of the previously ordered photographs.

On October 4, 2023, Mindy's therapist completed a limited, three-page report, which noted Mindy was being treated for acute stress disorder and anxiety stemming from "previous living situations," and the parents were "displaying appropriate care." Mindy's therapist did not address sibling visitation with Mary.

At a case management conference the same month, Mary's Law Guardian again requested sibling visitation, "even if it[ wa]s a therapeutic phone call" between Mary, Mindy, and a therapist. The Division submitted its October 11, 2023 report recommending sibling visitation, which the court again denied after Maya and Mindy's Law Guardian stated that Mindy "[wa]s fearful and d[id] not wish to visit [Mary]." The court stated it would consider granting sibling visitation after Mindy attended more therapy sessions. It suggested to Maya and Mindy's Law Guardian that Mindy's therapist discuss virtual sibling visits during Mindy's sessions. In December 2023, Maya and Mindy's Law Guardian conveyed to the court that Mindy's therapist informally reported that allowing visits between Mary and Mindy should "be guided . . . by how [Mindy] fe[lt] about those sibling visits."

During a January 2024 permanency hearing, the Division presented its plan to terminate Dawn's and Sara's parental rights to Mary and for Tia to adopt Mary. After the parties and Mary's Law Guardian consented to the plan, the court approved it. The court again addressed the Division's difficulties in facilitating Mary's court-ordered receipt of photographs of Maya and Mindy, because Mary "ha[d] only received about two photographs through[out] th[e] entire span of" the litigation.

A-3349-23

The Division submitted a March 5, 2024 report stating the parents were "unwilling to allow contact" between Mary and her siblings. A March 18, 2024 Division report confirmed the following: Tia's home was licensed, and she wanted to adopt Mary; Maya started speech therapy in August 2023, and Maya was using an Augmentative and Alternative Communication (AAC) device for speech; the Division referred the parents to psychological services; the parents had an active parenting meeting and agreed to take parenting classes; the Division continued to "recommend[] sibling visit[ation]"; and the Division recommended a psychological evaluation for Mindy.

On March 21, 2024, Mary's Law Guardian filed a motion for the court to schedule a Title 9 fact-finding hearing based on the Division's complaint, or, alternatively, to accept her proposed Title 9 complaint and schedule a fact-finding hearing. The next day, Mary's Law Guardian also filed a motion for a plenary hearing and sibling evaluations to assess the appropriateness of visitation. Four days later, the court ordered the Title 9 fact-finding hearing to be held "in abeyance pending the outcome of [Mary's] motions."

Mary's Law Guardian argued Mary was entitled to a statutory fact-finding hearing to demonstrate abuse or neglect based on the following allegations: Maya's school reported Dawn and Sara had not completed "the outside [Applied Behavior Analysis] services recommended and ha[d] been

verbally aggressive with staff on multiple occasions"; the parents called Mary "the other one" around Maya and Mindy; the parents had not officially relinquished parental rights; and neither Maya nor Mindy had received an NJ Cares psychological evaluation. It was stipulated that the "bulk" of the proposed new complaint was "the same" except for the mention of additional "services." Mary's Law Guardian further asserted Mary was entitled to a fact-finding hearing because of the lack of "competent evidence . . . presented to the [c]ourt regarding the abuse that she suffered and the risk posed to her and her siblings." Further, she argued a Title 9 hearing should be afforded because it impacts the court's decision on sibling visitation. Regarding opposition to acceptance of the settlement, Mary's Law Guardian requested Mary be given "an opportunity . . . to be heard" and that the court consider an "informal interview."

The Division and Maya and Mindy's Law Guardian opposed a plenary hearing and requested enforcement of the parties' settlement. The Division acknowledged Mary was permitted to "file her own complaint" but argued she was not permitted to prevent the Division from entering "settlement agreements," understanding the goal is "for the protection of [the] child." Highlighting that the court's "parens patriae" role was to act in Mary's best interests, the Division requested the settlement be accepted. Further, the

A-3349-23

Division argued Mary was "the subject of the litigation" but was not "a party," referencing that "she[ wa]s not served with a copy of the complaint" and was provided "a [L]aw [G]uardian" so "her voice c[ould] be heard." The parents similarly argued that holding "a fact-finding hearing . . . would be punitive," only the Division "gets to decide what [the ultimate] administrative finding is," and each parent "get[s] to decide" whether to "settle" or "litigate."

On April 30, 2024, after argument, the court denied Mary's motion. In denying Mary's motion for a Title 9 fact-finding hearing, the court highlighted the parties had "represented that it was going to be a lengthy trial" and that if the court found abuse or neglect after a trial, "the Division . . . solely has the ability to determine whether it[ i]s a substantiated or established finding." The court accepted that the Division and the parents had reached "a proposed settlement" to change the Division's "substantiated administrat[ive] finding to an established" finding. The court also dismissed the Division's complaint and retained jurisdiction under Title 30. The court noted that Maya and Mindy's Law Guardian agreed with the settlement. The court highlighted that "an established finding still . . . [showed] the Division found . . . abuse or neglect" under N.J.A.C. 3A:10-7.3. The court found Mary was not entitled to initiate separate proceedings pursuant to N.J.S.A. 9:6-8.34 simply because she disagreed "with [the] proposed settlement when [her] complaint [wa]s based

A-3349-23

upon the same allegations" that the Division had pleaded in its amended complaint. Further, the court reasoned the purpose of Title 9 was "[n]ot to punish the parents." The court observed Mary's Law Guardian's consent to terminating Dawn's and Sara's parental rights at the January 18, 2024 permanency hearing.

After the court denied Mary's Law Guardian's Title 9 motion, the Division requested the court to approve the settlement reached with the parents. The court heard testimony from the parents regarding their understanding of the settlement. Dawn acknowledged she understood that "the Division [wa]s going to change their finding from what is currently substantiated to established," she was waiving her right to continue with the "administrative appeal that was stayed," she had the right to a trial, and the established finding of abuse or neglect "would remain in the Division's file." Sara similarly acknowledged the Division would record a finding after the settlement of established abuse or neglect and that her appeal of the Division's administrative substantiated finding would be "withdraw[n]."

The court accepted the settlement of an "administrative finding of established" after noting the parents' testimony "[w]as credible" and they waived their right to "appeal." After putting its findings on the record, the court then noted "the Division move[d] to dismiss the Title 9" action.

The court also denied Mary's Law Guardian's sibling visitation motion, finding her requests for evaluations and a plenary hearing were unwarranted. Mary's Law Guardian argued there was a "clear dispute" about the appropriateness of sibling visitation, as "the position[s] of [Mary] and [Mindy] [we]re at odds." The Division and Mary's Law Guardian agreed that having no sibling visitation would harm Mary, while Maya and Mindy's Law Guardian and Dawn's and Sara's counsel expressed uncertainty whether harm existed. The Division expressed concerns that "a lot of the information provided to [Mindy's] therapist also c[a]me[] from the parents as to what they[ were] addressing in therapy," "the record [wa]s full of" Maya and Mindy's Law Guardian's representations of alleged harm to Mindy, and "[Mindy] [wa]s always seen in her home in her family unit."

Maya and Mindy's Law Guardian opposed sibling evaluations and a plenary hearing, arguing the following: Maya and Mindy were doing well without Mary in the home; it was not in Maya's or Mindy's best interests to interact with their biological family; Mindy did not want to see Mary; and it was questionable whether sibling visitation would start once Tia adopted Mary. Regarding a best interests evaluation, Maya and Mindy's Law Guardian stated that Maya is "severely autistic and non-verbal . . . . So, she would[ not] even be able to meaningfully participate in any type of evaluation."

16

Although the court found that denying sibling visitation was detrimental to Mary, it also found no factual dispute that Mindy did not want to see Mary. The court stated:

> I[t did not] think it[ was] necessary to have doctors opine about . . . what[ was] in the [siblings'] best interests. I[t did not] know that [the parties were] ever going to be able to answer that question, because the best interests of [Mary were] completely different than the best interests of [her siblings].

The court determined that "even if [it] were to grant a plenary hearing, . . . the issue [wa]s still going to be whose best interests g[ot] the upper hand."

Based on the court's "feel of the case," it concluded evaluations and a plenary hearing were unnecessary. It found an evaluation was not in Mindy's best interests because she would need to "meet[] with someone who[ was] not her parents, . . . a therapist," which is "a lot for a [six-]year old." The court made no specific findings as to Maya's best interests, determining Maya is "autistic" and "sort of her own little category because she is non-verbal."

On appeal, Mary argues the court erred in denying her motions for: a Title 9 abuse or neglect fact-finding hearing, because it failed to make specific findings and misinterpreted her statutory right to file a second complaint, and a plenary hearing for sibling visitation, following expert evaluations.

A-3349-23

II.

It is well established that "[a]ppellate courts defer to a trial court's factual findings when they are 'supported by adequate, substantial, credible evidence.'" N.J. Div. of Child Prot. & Permanency v. B.P., 257 N.J. 361, 373 (2024) (quoting Cesare v. Cesare, 154 N.J. 394, 411-12 (1998)). "We invest the family court with broad discretion because of its specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 427 (2012). However, "deference is . . . tempered when the trial court did not hear testimony[] or make credibility determinations based on the demeanor of witnesses." N.J. Div. of Child Prot. & Permanency v. S.K., 456 N.J. Super. 245, 262 (App. Div. 2018) (quoting N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 350 (App. Div. 2016)). Further, we review a court's interpretation of legal issues de novo. N.J. Div. of Child Prot. & Permanency v. J.R.-R., 248 N.J. 353, 368 (2021).

"A plenary hearing is required when the submissions show there is a genuine and substantial factual dispute regarding the welfare of the children . . . ." Hand v. Hand, 391 N.J. Super. 102, 105 (App. Div. 2007). "A court, when presented with conflicting factual averments material to the issues before it, ordinarily may not resolve those issues without a plenary hearing."

J.G. v. J.H., 457 N.J. Super. 365, 372 (App. Div. 2019) (quoting K.A.F. v. D.L.M., 437 N.J. Super. 123, 137 (App. Div. 2014)).  "When the evidence discloses genuine material issues of fact, the failure to conduct a plenary hearing to resolve those issues requires us to reverse and remand for such a hearing."  K.A.F., 437 N.J. Super. at 138.

III.

A. Title 9 Fact-Finding Hearing

We first address Mary's contention that the court erred in denying her request for a Title 9 fact-finding hearing.  Mary contends the court was prohibited from accepting the Division and parents' settlement to an established finding of abuse or neglect because she objected, moved to file a complaint on basically the same claims, and requested the court conduct a hearing.  She further argues a hearing is warranted because the court failed to make specific factual findings regarding Dawn's and Sara's acts of abuse or neglect against her and wrongly proceeded under Title 30.  Mary posits factual findings are relevant and necessary "to the extent that evidence of parental unfitness relates to the court's authority to order sibling visitation, evaluations, and any recommended therapeutic visitation services."  While we disagree with Mary's blanket assertion that the trial court is prohibited from accepting a Title 9 settlement if the child who was the subject of the abuse objects, we

19

agree in the present case that the court failed to make sufficient factual findings regarding Dawn's and Sara's conduct that constituted abuse or neglect.

We begin our analysis by acknowledging the legal principles governing Mary's Title 9 abuse or neglect fact-finding arguments. "Title [9] provides for the civil prosecution of a parent or guardian who abuses or neglects a child." J.R.-R., 248 N.J. at 368. "Title 9's purpose is clear: to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'" N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013) (quoting N.J.S.A. 9:6-8.8(a)). "The prevailing concern in abuse and neglect cases is the best interests of the child." N.J. Div. of Child Prot. & Permanency v. S.G., 448 N.J. Super. 135, 146 (App. Div. 2016); see also N.J.S.A. 9:6-8.8(a) (explaining that under Title 9, children's safety is "of paramount concern[,] and the best interests of the child shall be a primary consideration").

After the Department of Children and Families (Department) receives an abuse or neglect referral, the Division conducts an "investigation . . . designed to assess and assure a child's health and safety" and "gathers evidence regarding the child's condition, obtains statements from the child, interviews alleged perpetrators or other witnesses, requests available police reports, and consults with medical and educational professionals." N.J. Div. of Child Prot.

& Permanency v. V.E., 448 N.J. Super. 374, 386 (App. Div. 2017); N.J.S.A. 9:6-8.11 (describing the Division's responsibility to investigate allegations and take immediate action as "necessary to insure the safety of the child"); N.J.A.C. 3A:10-2.3, -3.1 to -3.3. In addition to the Department, the Family Part also "has jurisdiction to adjudicate determinations that a child is . . . abused or neglected." N.J.A.C. 3A:10-7.3(g).

"The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 328 (App. Div. 2011). "Abuse and neglect cases are generally fact sensitive," and "[e]ach case requires careful, individual scrutiny." N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 33 (2011); see also N.J. Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015) ("An analysis of a parent's conduct must account for the surrounding circumstances."). An abused or neglected child includes one:

> [W]hose physical, mental, or emotional condition has been impaired[,] or is in imminent danger of becoming impaired[,] as the result of the failure of his [or her] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical[,] or surgical care though financially able to do so or though offered financial or other reasonable means to do so, or (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing

21

to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court.

[N.J.S.A. 9:6-8.21(c)(4).]

If the Division brings a complaint, it bears the burden of proving that a parent abused or neglected a child by a preponderance of the evidence. J.R.-R., 248 N.J. at 369.

"The Department, through the Division, may take both administrative and judicial action." V.E., 448 N.J. Super. at 387 (citing N.J. Div. of Youth & Fam. Servs. v. D.F., 377 N.J. Super. 59, 64 (App. Div. 2005)). "Thus, concurrent review of the Division's findings of abuse or neglect may be undertaken." Ibid. For each abuse or neglect allegation, N.J.A.C. 3A:10-7.3(c) requires the Division to find that the "allegation is 'substantiated,' 'established,' 'not established,' or 'unfounded.'" An allegation is "substantiated" "if the preponderance of the evidence indicates that a child is . . . 'abused or neglected' . . . [under] N.J.S.A. 9:6-8.21 and either the investigation indicates the existence of any of the circumstances in N.J.A.C.

A-3349-23

3A:10-7.4[2] or substantiation is warranted based on consideration of . . . [N.J.A.C. 3A:10-7.5's] aggravating and mitigating factors." N.J.A.C. 3A:10-7.3(c)(1). An allegation is "'established' if the preponderance of the evidence indicates that a child is . . . 'abused or neglected' as defined in N.J.S.A. 9:6-8.21, but the act or acts committed or omitted do not warrant a finding of 'substantiated' as defined in . . . [N.J.A.C. 3A:10-7.3(c)(1)]." N.J.A.C. 3A:10-7.3(c)(2).

"A finding of either established or substantiated shall constitute a determination by the Department that a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.21." N.J.A.C. 3A:10-7.3(d). The "differentiation between the 'substantiated' and 'established' findings appears to be a question of the degree of harm and, possibly, the strength of the gathered proofs." V.E., 448 N.J. Super. at 389.

---

[2] N.J.A.C. 3A:10-7.4(a) provides that a finding of substantiated is required where the Division's investigation indicates: "[t]he death or near death of a child as a result of abuse or neglect"; a child has been subjected "to sexual activity or exposed to inappropriate sexual activity or materials"; "[t]he infliction of injury or creation of a condition requiring a child to be hospitalized or to receive significant medical attention"; "[r]epeated instances of physical abuse" against a child; "[f]ailure to take reasonable action to protect a child from sexual abuse or repeated instances of physical abuse under circumstances where the parent or guardian knew or should have known that such abuse was occurring"; "or [d]epriving a child of necessary care, which either caused serious harm or created a substantial risk of serious harm."

There are "numerous collateral consequences [that] flow from such a finding [of abuse or neglect]." N.J. Div. of Child Prot. & Permanency v. K.G., 460 N.J. Super. 467, 478 (App. Div. 2019) (quoting N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 619 (App. Div. 2010)). "[A] finding of abuse and neglect is forwarded by [the Division] to a central registry maintained by the Department . . . ." Ibid. (quoting N.S., 412 N.J. Super. at 619).

After a "perpetrator" has been included in a "report of substantiated or established abuse or neglect," they are provided notice that "[h]is or her name and identifying information are entered into the Department's child abuse registry, pursuant to N.J.S.A. 9:6-8.11." N.J.A.C. 3A:10-7.6(c)(2). "'[T]he impact of the Registry is substantial[,]' and '[t]he entry of an individual's name on the Central Registry gives rise to a significant liberty interest on the part of that individual.'" N.J. Div. of Youth & Fam. Servs. v. M.D., 417 N.J. Super. 583, 612-13 (App. Div. 2011) (all but first alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. V.M., 408 N.J. Super. 222, 237-38 (App. Div. 2009) (Carchman, P.J., concurring)). Relevant to the present case, "an established finding is a finding of child abuse or neglect under N.J.S.A. 9:6-8.21(c)(4), subject to disclosure as permitted by N.J.S.A. 9:6-8.10a(b) and other statutes." V.E., 448 N.J. Super. at 380.

A-3349-23

With this statutory and regulatory backdrop in mind, we turn to Mary's contention that reversal for a Title 9 fact-finding hearing is warranted. In addressing Mary's objection, the court reviewed the Division's May 26, 2023 amended complaint's claims of abuse or neglect. Mary stipulated that her proposed abuse or neglect claims were largely "the same" as the Division's. Regarding the allegations, the Division had administratively determined Dawn's and Sara's abuse or neglect of Mary was "substantiated," which the parents had disputed and administratively appealed. The Division thereafter negotiated a settlement with the parents, which provided the following: Dawn and Sara would stipulate to the abuse or neglect of Mary; the Division would change its substantiated finding of abuse or neglect to an established finding; Dawn and Sara would withdraw their administrative appeals filed; and the Division would then dismiss the Title 9 action. The Division and the parents requested the court accept the settlement over Mary's Law Guardian's objection. The Division's permanency plan was to terminate Dawn's and Sara's parental rights and for Tia to proceed with Mary's adoption. Dawn and Sara agreed to voluntarily terminate their parental rights to Mary, which Mary's Law Guardian consented to.

We reject Mary's contention that, so long as she objects, the court could not accept a settlement permitting Dawn and Sara to stipulate to an established

finding regarding the Division's abuse or neglect claims—which are "the same" claims she alleges.  Although we recognize Mary's Law Guardian had a right to initiate a Title 9 complaint under N.J.S.A. 9:6-8.34, we disagree with Mary's assertion that the court was mandated to proceed to trial based on her objection and proposed complaint.  As the child who was the subject of the alleged abuse or neglect, Mary, through her Law Guardian, had the right to object, but that alone is not dispositive and is rather a factor for the court to consider.  See N.J.S.A. 9:6-8.23(a) (requiring representation of a child who is the subject of the proceeding by a Law Guardian "to help protect his [or her] interests and to help him [or her] express his [or her] wishes to the court" and permitting "any other interested person or agency" to appear by counsel).  The court had the authority to review the proposed settlement, including the parents' admitted acts of abuse or neglect.

Mary accurately states that the Division, pursuant to N.J.S.A. 9:6-8.35(c), cannot prevent any person from filing a complaint, but here the Division "originate[d the] proceedings."  N.J.S.A. 9:6-8.34.  The Division complied with its charge to "[c]onfer with any person seeking to file a complaint, the potential respondent, and other interested persons concerning the advisability of filing a complaint under this act."  N.J.S.A. 9:6-8.35(a).  The Division included in its amended complaint all of Mary's abuse

A-3349-23

allegations. As her Law Guardian acknowledged, Mary's proposed complaint's claims were the same as those contained in the Division's complaint.

Mary cites no precedent, nor has our research revealed any authority, supporting her argument that, if a child who was the subject of the abuse or neglect objects, the court is precluded from accepting a Title 9 settlement if it is satisfied abuse or neglect was sufficiently established and no new allegations are asserted. Taken to its ultimate extreme, Mary in essence argues a court may not accept a defendant's factual admission of abuse or neglect to every pleaded claim and must hold a trial based on the subject child's objection. Relevantly, N.J.S.A. 9:6-8.50(a) provides that "[i]f facts sufficient to sustain the complaint are established, the court shall enter an order finding that the child is an abused or neglected child and shall state the grounds for said findings." (Emphasis added). Contrary to Mary's position, "[t]he 'primary concern' under Title 9 'is the protection of children, not the culpability of parental conduct.'" V.E., 448 N.J. Super. at 403 (quoting G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 177 (1999)). Here, while we agree the court was plainly required to make appropriate findings regarding the stipulated abuse when accepting the settlement, which it failed to do, we do not agree it could not accept the settlement.

27                                                              A-3349-23

In determining whether to accept a settlement over the objection of the child who was subjected to the alleged abuse, we hold that in determining if the settlement is in the child's best interests, the court must consider the abuse or neglect claims, the settlement stipulations, the parents' factual admissions, whether the parents' agreement is knowing and voluntary, the child's objection, and any other relevant factors. We disagree with Mary's contention that the court may not consider the interests of her siblings as the court may consider other relevant interests. Recognizing Title 9's focus is primarily on the safety of the subject child, if the court is satisfied after a full consideration of the issues that the settlement is appropriate, it may accept the settlement over an objection but must make sufficient factual findings of abuse or neglect.

While we conclude the court may accept an abuse or neglect settlement over the subject child's objection, the present record is insufficient to determine whether a Title 9 hearing is warranted. It is undisputed the Division's dismissal of its complaint was premised on the parents' stipulation to abuse or neglect and the withdrawal of their administrative appeals. As the complaint was not withdrawn and the settlement was to the parents' stipulation of a finding of established abuse or neglect, the court was required to make sufficient factual findings on Dawn's and Sara's specific conduct.

28

We are unpersuaded by the parties' argument in opposition that the court was not required to make findings because it was asked only to accept the parents' stipulation to the "administrative finding" of abuse or neglect. In that regard, N.J.S.A. 9:6-8.50(c) directs that a court may dismiss an abuse or neglect complaint "[i]f facts sufficient to sustain the complaint . . . are not established, or the court concludes that its assistance is not required on the record before it, . . . and shall state the grounds for the dismissal." However, in the present case, the court was asked to accept the parents' settlement to abuse or neglect findings that was conditioned on their withdrawal of their administrative appeals and waiver of their rights to appeal before the Division would dismiss its complaint. Under these facts, the court had to be "satisfied that there [wa]s a factual basis from which to conclude that [parents] ha[d] committed some specific act or acts which constitute abuse or neglect as defined in N.J.S.A. 9:6-8.21(c) and that the [they] willingly, knowingly[,] and voluntarily agree[d] that [they] ha[d] committed these acts." M.D., 417 N.J. Super. at 610 (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 266 (App. Div. 2002)). Mary had the right to object to the court's lack of specific findings.

We acknowledge that "[i]n general, 'stipulations permit parties in a civil case to agree on relevant facts, thereby narrowing the area of dispute requiring

the production of evidence and promoting the efficient administration of justice.'" N.J. Div. of Youth & Fam. Servs. v. N.D., 417 N.J. Super. 96, 112 (App. Div. 2010) (quoting J.Y., 352 N.J. Super. at 265); see also M.D., 417 N.J. Super. at 617 n.18 (recognizing "the utility of stipulations in criminal and quasi-criminal matters"). However, when entering a factual stipulation to support a finding of abuse or neglect, the stipulation must contain definite terms, and the parties' consent to enter it must be clearly established. M.D., 417 N.J. Super. at 610. The court must be advised "which specific provision of N.J.S.A. 9:6-8.21(c) is expected to be proven by way of defendant's stipulated facts." N.J. Div. of Child Prot. & Permanency v. S.W., 448 N.J. Super. 180, 193 (App. Div. 2017) (quoting M.D., 417 N.J. Super. at 617).

The court "has the ultimate responsibility of conducting adjudicative proceedings in a manner that complies with required formality in the taking of evidence and the rendering of findings." Ibid. Further, the court must have "sufficient undisputed facts from the record that adequately support the . . . finding[s]." See J.D., 447 N.J. Super. at 353. We have held that a remand is required when there are "legal defects permeating the 'fact-finding' process." J.Y., 352 N.J. Super. at 267.

Here, after the court denied Mary's motion to proceed with a Title 9 fact-finding hearing, Dawn and Sara were each questioned by counsel regarding

their knowing and voluntary stipulation to an established abuse or neglect finding and the waiver of their rights. While they both waived the right to a trial and to proceed with their administrative appeals, each parent simply agreed to the administrative established finding without acknowledging any act of abuse or neglect against Mary.[3] The record demonstrates the parents did not stipulate to any allegations establishing abuse or neglect and, therefore, it is unknown what record the Department would maintain in the registry. N.J.S.A. 9:6-8.11; N.J.A.C. 3A:10-7.6(c)(3). The agreement to terminate Dawn's and Sara's parental rights, resolving the Title 30 action by entering a judgment of guardianship, does not substantiate abuse or neglect. See N.J. Div. of Youth &

---

[3] Moreover, courts are required to ensure that defendants sign a stipulation order outlining the specific allegations of abuse or neglect admitted. See Super. Ct. of N.J., CN 10262, Order – Stipulation/Admission of Fact-Finding Trial (Dec. 2025). Further, defendants are required to sign a voluntary stipulation and admission form. See Super. Ct. of N.J., CN 11539, Voluntary Stipulation and Admission to Child Abuse and/or Neglect Pursuant to N.J.S.A. 9:6-8.21(c) (Aug. 2019). We note these forms are mandatory and it appears they were not completed. See Sup. Ct. of N.J. Fam. Div., Children in Court Operations Manual § 1061.3, .5 (rev. Dec. 2025). The Children in Court Operations Manual was revised in December 2025 to reflect a change in terminology from "Compliance Review" to "Status Review" in FN docket matters. See Admin Off. of the Cts., Admin. Directive #08-25, Family – Children in Court – Change in Terminology: Renaming "Compliance Review" to "Status Review" (Dec. 5, 2025).

Fam. Servs. v. I.S., 214 N.J. 8, 37 (2013) (emphasizing that Title 9 and Title 30 "operate independently from one another").[4]

We further note the court's determination that Dawn and Sara knowingly waived their rights to appeal the established abuse or neglect findings was unsupported as they admitted no specific facts supporting abuse or neglect and, therefore, it is unclear what would be included in the registry. While we recognize the court must balance the best interests of the abused child, the "[p]arents' rights," and "the State's parens patriae responsibility to protect the welfare of children," making sufficient findings does not prejudice those interests. M.D., 417 N.J. Super. at 617 (quoting N.D., 417 N.J. Super. at 109).

For these reasons, we conclude the court was not precluded from accepting an abuse or neglect settlement with Mary's best interests in mind, but it failed to make sufficient factual findings to support a determination that Dawn and Sara "credibly" agreed to the "finding of established" abuse or

---

[4] We note that the court's "Compliance Review" order under the "FN" docket noted it was "accepting the settlement" as to Title 30 established findings and that the parents "knowingly, willingly, and voluntarily agreed to the [e]stablished [f]inding remaining in the [D]ivision file and waive[d] their right to appeal the administrative [e]stablished [f]inding." The record indicates the settlement was to abuse or neglect findings under the Division's Title 9 complaint. "N.J.S.A. 30:4C-12 is not a substitute for an abuse or neglect proceeding or a guardianship action." N.J. Dep't of Children and Fams., Div. of Youth and Fam. Servs. v I.S., 214 N.J. 8, 37 (2013) (quoting N.J. Div. of Youth & Fam. Servs. v. J.C., 423 N.J. Super. 259, 267-68 (App. Div. 2011)).

neglect against Mary.  We therefore remand for the court to make sufficient Title 9 factual findings.  See N.J. Div. of Child Prot. & Permanency v. T.S., 463 N.J. Super. 142, 168 (App. Div. 2020) ("[F]ailure to perform the fact-finding duty 'constitutes a disservice to the litigants, the attorneys[,] and the appellate court.'  Meaningful appellate review is inhibited unless the judge sets forth the reasons for his or her opinion." (first alteration in original) (quoting Salch v. Salch, 240 N.J. Super. 441, 443 (App. Div. 1990))); see also R. 1-7:4(a).

In sum, the court may accept an abuse or neglect settlement if it is satisfied the settlement is in the child's best interests after considering the abuse or neglect claims, the settlement stipulations, Dawn's and Sara's factual admissions, Mary's objection, and any other relevant factors.

## B. Sibling Visitation

We next address Mary's challenge to the court's denial of her request for evaluations and a plenary hearing to address sibling visitation.  Mary argues that she has a presumptive right to sibling visitation under the CPBRA and SBR.  Additionally, she argues there is sufficient prima facie evidence demonstrating harm resulting from the denial of visitation to herself and her siblings.  After a review of the record, we agree.

We are mindful of the court's well-intentioned concern of not causing Maya and Mindy more distress. That concern, however, was not based on a factual record. We part ways with the court's decision: denying sibling visitation; finding best interests evaluations of Maya and Mindy were unwarranted; viewing Maya's and Mindy's best interests as one; and finding a plenary hearing was unwarranted because Mary failed to make a prima facie showing of factual disputes regarding the siblings' welfare and best interests.

Our Supreme Court has explained that "a sibling relationship can be an independent emotionally supportive factor for children in ways quite distinctive from other relationships, and there are benefits and experiences that a child reaps from a relationship with his or her brother(s) or sister(s)[,] which truly cannot be derived from any other." N.J. Div. of Youth & Fam. Servs. v. S.S., 187 N.J. 556, 560-61 (2006) (quoting L. v. G., 203 N.J. Super. 385, 395 (Ch. Div. 1985)). The CPBRA, which contains the codified SBR, provides that a child placed outside of the home has twenty-six enumerated rights, including:

> To be actively involved in the lives of the child's siblings, including planning and attending celebrations, birthdays, holidays, graduations, and other meaningful milestones, to the greatest extent possible;
>
> . . . .

> To not have sibling visits, including phone calls and virtual visits, be denied as a result of behavioral consequences . . . .
>
> [N.J.S.A. 9:6B-4(u), (v).]

When the Legislature enacted the SBR, it declared the importance of siblings' relationships and provided that prior to adoption "[s]iblings should be supported by the [Department] in their efforts to maintain relationships." N.J.S.A. 9:6B-2.2(d).[5]

Our Supreme Court in In re D.C. addressed the standards applicable to a sibling's visitation request both pre- and post-adoption. 203 N.J. 545, 551 (2010). During the pre-adoption placement period, the CPBRA obligates the Division "to nurture sibling bonds . . . whether or not a sibling has initiated the process and whether or not termination [of parental rights] has occurred." Id. at 564. Pursuant to the CPBRA, "the Division is obliged, on its own and even in the absence of an application by a sibling, to insure and facilitate such visitation under N.J.S.A. 9:6B-4(f), up until the time that an adoption is

---

[5] The Legislature has also recognized the importance of fostering "intergenerational family relationships" and "sibling bonds" under the Grandparent and Sibling Visitation Statute (GSVS), N.J.S.A. 9:2-7.1. In re D.C., 203 N.J. 545, 559-61 (2010). The GSVS provides that "[a] grandparent or any sibling of a child residing in this State may make application before the Superior Court, in accordance with the [Court Rules], for an order for visitation." N.J.S.A. 9:2-7.1(a). The applicant shall bear the "burden . . . to prove by a preponderance of the evidence that the granting of visitation is in the best interests of the child." Ibid.

A-3349-23

finalized." Id. at 565. N.J.S.A. 9:6B-4(f) specifically affords a child the right "[t]o visit with the child's sibling on a regular basis and to otherwise maintain contact with the . . . sibling if the child was separated from his [or her] sibling upon placement outside his [or her] home" and provides for the "arrangement of transportation as necessary . . . [and] access to a phone number or computer that allows for virtual visits between face-to-face visits or when face-to-face visits are not feasible."

During the pre-adoption placement period, the court may prohibit visitation if it is "show[n] that visitation would be inconsistent 'with the health, safety, and physical and psychological welfare of the child' and is inappropriate 'to the individual circumstances of the child's physical or mental development.'" D.C., 203 N.J. at 565 (quoting N.J.S.A. 9:6B-4). The harm to the child must be "a particular identifiable harm, specific to the child." K.D. v. A.S., 462 N.J. Super. 619, 630 (App. Div. 2020) (quoting Mizrahi v. Cannon, 375 N.J. Super. 221, 234 (App. Div. 2005)). To preclude the right to sibling visitation, the court must find that having sibling visitation is contrary to a child's welfare. D.C., 203 N.J. at 551.

In the present case, the record supports the court's finding that Mary unquestionably will suffer harm from not having sibling visitation. Also, Mary's Law Guardian and the Division continuously requested visitation to

36

continue the siblings' bonds. In denying sibling visitation, the court improvidently disregarded the Division's multiple recommendations that sibling visitation was in the children's best interests and its concerns that Dawn and Sara influenced Mindy's resistance to visitation with Mary. In recommending visitation over the course of eleven months, the Division correctly recognized the presumption of pre-adoptive sibling visitation rights under the CPBRA and SBR "to support . . . th[eir] connection." The Division conveyed valid concerns that much of the information relayed "to . . . [Mindy's] therapist also c[ame] from the [parents]."

Further, the Division questioned whether there were "impartial representation[s]" regarding visitation, because it "never had the ability to look at" whether there was "really a harm" from sibling visitation or "just people's speculation of the harm." Here, the strong statutory pre-adoption sibling visitation presumption, which the Division is charged to facilitate and foster, was not sufficiently overcome with credible evidence. See D.C., 203 N.J. at 565 ("[I]n a case in which the siblings of a child in placement seek visitation with that child, such visitation is the presumptive state of affairs.").

The record validates the Division's asserted concerns that caseworkers always saw Mindy "in her home in her family unit" with Dawn and Sara nearby, not in "independent situations." The Division correctly highlighted

37

that the parents failed to abide by multiple court orders to provide Mary with photographs of her siblings. Further, the parents allegedly referred to Mary as "the other one" in front of Maya and Mindy, further raising questions surrounding their resistance to fostering the siblings' relationships and preventing a fair assessment of the siblings' best interests. It was undisputed that the girls had spent their young lives together. Further, the court's failure to properly address and order sibling visitation during a Title 9 proceeding has the likely consequences of detrimentally affecting the siblings' bonds and negatively impacting their future visitation.

In support of her request for visitation, Mary posited valid concerns emphasizing the importance of sibling visitation based on her relationship with her siblings and fears they "may be exposed to . . . [future] harm" similar to the abuse she suffered. The record demonstrates Mary reported to Dr. Lanese that Dawn and Sara would occasionally get frustrated with Maya and Mindy. Mary alleged she observed Dawn slap Maya, and Dawn and Sara hit Mindy with a hairbrush. The Division's and Mary's factually supported concerns established cause for the court to order evaluations and a hearing to explore the siblings' best interests in having visitation.

Our Supreme Court has stated, "Judges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of

harm." A.L., 213 N.J. at 28 (recognizing that expert testimony may be helpful based on "the fact-sensitive nature of abuse and neglect cases"). "Where visitation issues are disputed, or where a plenary hearing would assist the court in deciding on a visitation plan, such a hearing should be held." P.T. v. M.S., 325 N.J. Super. 193, 214 (App. Div. 1999).

The court's denial of Mary's request for evaluations discounted how expert evaluations would assist its determination regarding the siblings' bests interests.[6] The record supports the determination that the court should have ordered trained medical experts to conduct independent evaluations. Expert evaluations of each child would better reveal the benefits and harms of visitation and assist the court in its sibling visitation determination.

Further, the court was required to individually review both Maya's and Mindy's best interests. In the present case, the court focused primarily on Mindy, acknowledging it did not "mean . . . to [ignore] M[aya]" and observing that Maya "is autistic." Maya and Mindy's Law Guardian made similar observations regarding Maya and argued that Maya is "severely autistic and non-verbal" and "would[ not] even be able to meaningfully participate in any type of evaluation," an argument Dawn and Sara joined. We, however, are

_____

[6] We also note Mary had requested the court provide her with an opportunity to be heard. Pursuant to Rule 5:12-4(b), it was within the court's discretion to interview Mary as the child subject to the alleged abuse or neglect.

unpersuaded that there was any evidence in the record establishing that a trained professional could not effectively evaluate Maya's needs and best interests. The record does not support the conclusion that an expert specialized in evaluating children with autism spectrum disorder could not communicate with Maya and assess her best interests in having sibling visitation with Mary. To the contrary, the record indicates Maya began occupational and speech therapy in 2023 and can communicate through an AAC device.

The current record does not demonstrate that, because Maya is a child with autism spectrum disorder, she did not develop an individual bond with Mary during the six-and-a-half years they resided together as sisters and would not suffer harm if their bond was broken. On remand, the court shall separately review Maya's best interests, as no evidence in the record demonstrates that her limited verbal abilities preclude her from expressing herself through other means.

We also add that the court has the authority to appoint a Guardian Ad Litem (GAL) to address concerns regarding the siblings' welfare and best interests. "In all cases in which custody or parenting time/visitation is an issue, a . . . [GAL] may be appointed . . . if the circumstances warrant such an appointment." R. 5:8B(a). There exists "a distinct difference between a [L]aw

[G]uardian as provided for by R[ule] 5:8A[,] who must be all attorneys-at-law, and a [GAL] as provided for in R[ule] 5:8B, who need not be an attorney-at-law." Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002) (quoting In re Adoption of a Child by E.T., 302 N.J. Super. 533, 539 (App. Div. 1997)). "[T]he basic role of a [L]aw [G]uardian for . . . a minor is to 'zealously advocate the client's cause' whereas the basic role of a [GAL] is to assist the court in its determination of the . . . minor's best interest." Ibid. (quoting E.T., 302 N.J. Super. at 539). The court has the authority to appoint a GAL for Maya and Mindy regarding visitation if it would aid in addressing each child's welfare and best interests.

Further, while the court primarily discussed in-person sibling visitation, it had the alternative options of ordering supervised visitation, virtual visitation, or telephonic communication to foster the siblings' relationships. The siblings spent their lives together until January 2023, when Mary was removed from Dawn's and Sara's care. On remand, in considering whether sibling visitation would be detrimental to Maya's and Mindy's health, safety, and welfare, the court shall also consider and examine the different available options for the siblings to maintain a relationship while best interests evaluations are completed.

Sara and the Division argue that Mary may petition in the future for sibling visitation in a separate GSVS action. We are not persuaded. Mary timely raised the visitation issue in the Title 9 proceeding, and the CPBRA presumptively entitles Mary to such visitation unless it is against her siblings' welfare and best interests. We recognize that in addition to "non-parent relatives seeking . . . visitation regarding minor children" in a Title 9 "abuse and neglect matter[]," they may also file an application for visitation under the "FD docket," which is also known as the "non-dissolution docket." B.C. v. N.J. Div. of Child Prot. & Permanency, 450 N.J. Super. 197, 205 (App. Div. 2017) (first quoting R.K. v. D.L., 434 N.J. Super. 113, 131 (App. Div. 2014); then quoting I.S., 214 N.J. at 22 n.3; and then quoting R.K., 434 N.J. Super. at 130-31). Family Part "[j]udges who handle FN and FD dockets may choose to handle the matters separately or at the same time." Id. at 206. In the present matter, delaying a determination on sibling visitation for a collateral proceeding is not supported and not in the siblings' best interests. Moreover, precluding a review of sibling visitation in this action is contrary to Mary's presumptive statutory sibling visitation rights.

In sum, under the CPBRA, Mary had the presumptive right to be actively involved with her siblings pre-adoption and sufficiently demonstrated a prima facie showing that precluding sibling visitation resulted in harm. Therefore,

42

evaluations and a plenary hearing were warranted. On remand, the court must undertake a fact-intensive analysis and make specific findings as to each child's best interests and determine whether visitation would be inconsistent with each child's "health, safety[,] and physical and psychological welfare." N.J.S.A. 9:6B-4. The court shall expeditiously order evaluations, and after their completion, hold an evidentiary hearing within thirty days.

Given that the court extensively considered this matter, entered multiple orders, and expressed its opinions, we direct on remand that the matter be considered by a different court. See Graziano v. Grant, 326 N.J. Super. 328, 349 (App. Div. 1999) (explaining the authority allowing the remand of a case to a different judge "may be exercised when there is a concern that the trial judge has a potential commitment to his or her prior findings").

Reversed and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-3349-23